**Faith RINGGOLD, Plaintiff–Appellant,**

v.

**BLACK ENTERTAINMENT TELE-VISION, INC., Home Box Office, Inc., Defendants–Appellees.**

**No. 1736, Docket 96–9329.**

United States Court of Appeals, Second Circuit.

Argued May 1, 1997.

Decided Sept. 16, 1997.

Barbara Hoffman, New York City, for Plaintiff–Appellant.

Kim J. Landsman, New York City (David M. Levin, Patterson, Belknap, Webb & Tyler, New York City, on the brief), for Defendants–Appellees.

(Dorothy M. Weber, Judith A. Kaminsky, Shukat Arrow Hafer & Weber, New York City; Michael D. Remer, Cowan, DeBaets, Abraham & Sheppard, New York City, submitted brief for amici curiae The Artists Rights Society, Inc. and The Picasso Administration).

Before: MESKILL and NEWMAN, Circuit Judges, and McAVOY,* Chief District Judge.

JON O. NEWMAN, Circuit Judge:

This appeal primarily concerns the scope of copyright protection for a poster of an artistic work that was used as set decoration for a television program. Faith Ringgold appeals from the September 24, 1996, judgment of the District Court for the Southern District of New York (John S. Martin, Jr., Judge) dismissing, on motion for summary judgment, her copyright infringement suit against Black Entertainment Television, Inc. ("BET") and Home Box Office, Inc. ("HBO"). The District Court sustained defendants' de-

* Honorable Thomas J. McAvoy, of the United States District Court for the Northern District of New York, sitting by designation.

fense of fair use. We conclude that summary judgment was not warranted, and we therefore reverse and remand for further consideration of plaintiff's claim.

### Background

1. *The copyrighted work.* Faith Ringgold is a successful contemporary artist who created, and owns the copyright in, a work of art entitled "Church Picnic Story Quilt" (sometimes hereafter called "Church Picnic" or "the story quilt").[1] "Church Picnic" is an example of a new form of artistic expression that Ringgold has created. She calls the form a "story quilt design." These designs consist of a painting, a handwritten text, and quilting fabric, all three of which Ringgold unites to communicate parables. The painting is a silk screen on silk quilt. "Church Picnic" is an example of this unusual art form, conveying aspects of the African–American experience in the early 1900's. The painting component of the work depicts a Sunday school picnic held by the Freedom Baptist Church in Atlanta, Georgia, in 1909. Above and below the painting are twelve numbered panels containing a text written in the idiomatic African–American dialect of the era.

The text relates the thoughts of a parishioner who attended the picnic and is waiting to tell her daughter about it when the daughter comes home. The parishioner's daughter is in love with the church pastor, but, as depicted in the painting, the pastor is in love with another woman, and he soon will ask that other woman to marry him. Because the young woman was born out-of-wedlock, the pastor's "high-brow" family is dismayed by the prospect of the imminent engagement. Surrounding the text and painting is a quilted border, consisting of multi-colored triangular shapes of fabric. The very edge of the work is finished with a thin red welt.

Although Ringgold has retained all rights in the copyright in "Church Picnic," the work itself is owned by the High Museum of Art (the "High Museum") in Atlanta, Georgia. Since 1988 the High Museum has held a non-exclusive license to reproduce "Church Picnic" as a poster (" 'Church Picnic' poster" or "the poster"), and to sell those reproductions. The "Church Picnic" poster sells for $20.00 a copy and was not produced as a limited edition. Thousands of copies of the poster have been sold since 1988. Although the license to reproduce poster copies of "Church Picnic" has terminated, copies of the poster remain available for sale.

Below the portion of the poster that displays "Church Picnic" are several identifying words. "High Museum of Art" appears in letters 1 1/4 inches high. Below these words is the phrase "Faith Ringgold, *Church Picnic Story Quilt,* 1988, gift of Don and Jill Childress" in letters 1/8 inch high. Below this line, in smaller type, appears "Courtesy Bernice Steinbaum Galley, New York City. Poster 1988 High Museum of Art, Atlanta."

2. *The alleged infringing use.* HBO Independent Productions, a division of HBO, produced "ROC," a television "sitcom" series concerning a middle-class African–American family living in Baltimore. Some time prior to 1992, HBO Independent Productions produced an episode of ROC in which a "Church Picnic" poster, presumably sold by the High Museum, was used as part of the set decoration.

The title character of "ROC" lives with his wife, Eleanor, his adult brother, Joey, and his father. In the episode in question, Roc pressures Joey, a jazz trumpeter, into giving trumpet lessons to some children in the church congregation, so that Joey, a perpetually unemployed gambler, can earn money to repay a debt he owes to Roc. After the children have taken some lessons, the minister of the church suggests that they give a recital in the newly-remodeled church hall. A five-minute scene of the recital concludes the episode. The "Church Picnic" poster was used as a wall-hanging in the church hall.

---

1. Ringgold's affidavit calls the work "Church Picnic." Affidavit of Faith Ringgold ¶ 3. Her complaint calls it "Church Picture Quilt." Complaint ¶ 7. Her brief calls it "The Church Picnic Story Quilt." Brief for Appellant at 7. The certif- icate of copyright registration calls it "Church Picnic Story Quilt." Joint Appendix at A–77. We will use either the title in the artist's own affidavit or "the story quilt," meaning the particular example of the generic form of work.

As the church audience waits to hear the recital, Roc and Eleanor are standing in the background of the scene, next to the audience and slightly to the left of the poster. The minister is also standing in the background, slightly to the right of the poster. The children play very poorly, and it is evident to Roc and Eleanor that Joey has not taught them anything. The scene and the episode conclude with parents of some of the children thanking Joey for the lessons, each set of parents believing that their child played on key but was drowned out by the other children.

In the scene, at least a portion of the poster is shown a total of nine times. In some of those instances, the poster is at the center of the screen, although nothing in the dialogue, action, or camera work particularly calls the viewer's attention to the poster. The nine sequences in which a portion of the poster is visible range in duration from 1.86 to 4.16 seconds. The aggregate duration of all nine sequences is 26.75 seconds. We describe these sequences in more detail below.

The copy of the poster used in the episode was framed without the identifying wording that appears beneath the artwork. As framed, the poster includes a notice of copyright, but the type is too small to be discernible to a television viewer.

A broadcast television network first televised the episode in 1992, and in October 1994 BET aired the episode for the first time on cable television. In January 1995, Ringgold happened to watch the episode on BET (apparently a repeat showing), and at that time became aware of the defendants' use of the poster as part of the set decoration.

3. *District Court proceedings.* Ringgold sued the defendants, alleging infringement of her copyright in "Church Picnic Story Quilt," in violation of 17 U.S.C. § 106 (1994), because of the unauthorized use of the poster as part of the set decoration for the episode of "ROC." The complaint also alleged common law unfair competition and a violation of New York's statute protecting artistic authorship rights. *See* N.Y. Arts & Cult. Aff. Law § 14.03 (McKinney Supp.1995).

Prior to discovery, the defendants moved for summary judgment, contending (i) that they were not liable for copyright infringement, because their use of the story quilt was either *de minimis* or a fair use, (ii) that the unfair competition claim was preempted by the Copyright Act, and (iii) that either (a) the plaintiff had not stated a claim under the Artists' Authorship Rights Law, or (b) the Court should decline to exercise supplemental jurisdiction over that state law claim. Ringgold cross-moved for a preliminary injunction to prevent further displays of her art in the sitcom episode.

The District Court denied the plaintiff's motion for a preliminary injunction, granted defendants' motion for summary judgment, and dismissed the complaint. Apparently accepting, or at least assuming, that the plaintiff had sufficiently alleged a claim of copyright infringement, Judge Martin rejected her infringement claim on the ground that undisputed facts established the defendants' fair use defense. He then dismissed her unfair competition claim on the ground of preemption, which she did not dispute, and declined to exercise supplemental jurisdiction over her remaining state law claim.

### Discussion

■ The Copyright Act grants certain exclusive rights to the owner of a copyright, *see* 17 U.S.C. § 106 (1994), including the right to make and distribute copies and derivative works based on the copyrighted work, and the right to display the copyrighted work publicly, *id.* § 106(1)-(3), (5). In the absence of defenses, these exclusive rights normally give a copyright owner the right to seek royalties from others who wish to use the copyrighted work. *See American Geophysical Union v. Texaco, Inc.,* 60 F.3d 913, 929 (2d Cir.1994, *as amended,* July 17, 1995) ("*American Geophysical*"); *see also DC Comics, Inc. v. Reel Fantasy, Inc.,* 696 F.2d 24, 28 (2d Cir.1982) (noting that one benefit of owning a copyright is the right to license its use for a fee). Ringgold contends that the defendants violated this licensing right by using the "Church Picnic" poster to decorate the set of their sitcom without her authorization.

The caselaw provides little illumination concerning claims that copyright in a visual work has been infringed by including it within another visual work. *Compare Woods v. Universal City Studios, Inc.*, 920 F.Supp. 62 (S.D.N.Y.1996) (film infringed architectural drawing), *with Monster Communications, Inc. v. Turner Broadcasting System, Inc.*, 935 F.Supp. 490 (S.D.N.Y.1996) (preliminary injunction denied to bar showing of film that included copyrighted film clips). The Nimmer treatise posits the problem of a motion picture in which an actor is reading a magazine of which the cover picture is observable, and acknowledges that "[t]he answer is by no means certain." *See* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[D][3], at 13–229 (1997) (*"Nimmer"*). The treatise observes, with uncharacteristic ambivalence, that a fair use defense might be supported on the ground that "the entire work does not supplant the function of the plaintiff's work," yet also points out that "ordinarily" the copying of a magazine cover into another medium "will constitute infringement, and not fair use." *Id.*

HBO and BET defend their use of the poster on two separate, though related grounds: (a) that their use of the poster was *de minimis*, and (b) that, as Judge Martin ruled, their use of the poster was a permissible "fair use," *see* 17 U.S.C. § 107.

I. *De minimis*

A. The *de minimis* Concept in Copyright Law

The legal maxim *"de minimis non curat lex"* (sometimes rendered, "the law does not concern itself with trifles") insulates from liability those who cause insignificant violations of the rights of others. In the context of copyright law, the concept of *de minimis* has significance in three respects, which, though related, should be considered separately.

■ First, *de minimis* in the copyright context can mean what it means in most legal contexts: a technical violation of a right so trivial that the law will not impose legal consequences. Understandably, fact patterns are rarely litigated illustrating this use of the phrase, for, as Judge Leval has observed, such circumstances would usually involve "[q]uestions that never need to be answered." Pierre N. Leval, *Nimmer Lecture: Fair Use Rescued*, 44 U.C.L.A. L.Rev. 1449, 1457 (1997). He offers the example of a *New Yorker* cartoon put up on a refrigerator.[2] In *Knickerbocker Toy Co. v. Azrak–Hamway International, Inc.*, 668 F.2d 699, 703 (2d Cir.1982), we relied on the *de minimis* doctrine to reject a toy manufacturer's claim based on a photograph of its product in an office copy of a display card of a competitor's product where the display card was never used. *See id.* at 702.

■ Second, *de minimis* can mean that copying has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying. *See Nimmer* § 13.03[A], at 13–27. In applying the maxim for this purpose, care must be taken to recognize that the concept of "substantial similarity" itself has unfortunately been used to mean two different things. On the one hand, it has been used as the threshold to determine the degree of similarity that suffices, once access has been shown, as indirect proof of copying; on the other hand, "substantial similarity" is more properly used, after the fact of copying has been established, as the threshold for determining that the degree of similarity suffices to demonstrate actionable infringement. *See Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 139–40 (2d Cir.1992); *Nimmer* § 13.01[B]. Professor Latman helpfully suggested that when "substantial similarity" is used to mean the threshold for copying as a factual matter, the better term is "probative similarity," and that "substantial similarity" should mean only the threshold for actionable copying. *See* Alan Latman, *"Probative Similarity"* as

---

2. Presumably, Judge Leval has in mind the posting of a photocopy of the cartoon; photocopying the cartoon, if not insulated by the doctrine of *de minimis,* or subject to some recognized defense, might violate the copyright proprietor's right to reproduce a copy of the work, *see* 17 U.S.C. § 106(1), though if the original page of the magazine was posted, the work would not have been "display[ed] ... publicly," *id.* § 106(5).

*Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement*, 90 Colum. L.Rev. 1187, 1204 (1990). The Nimmer treatise endorses and has implemented the Latman taxonomy, *see Nimmer* § 13.01[B], at 13–12, & n. 31.1, as has this Court, *see Laureyssens*, 964 F.2d at 140.

In the pending case, there is no dispute about copying as a factual matter: the "Church Picnic" poster itself, not some poster that was similar in some respects to it, was displayed on the set of defendants' television program. What defendants dispute when they assert that their use of the poster was *de minimis* is whether the admitted copying occurred to an extent sufficient to constitute actionable copying, *i.e.*, infringement. That requires "substantial similarity" in the sense of actionable copying, and it is that sense of the phrase to which the concept of *de minimis* is relevant.

■ At first glance, it might seem odd to pursue an inquiry as to "substantial similarity" even after copying as a factual matter has been established. However, the superficial anomaly reflects only a lack of appreciation of the difference between factual copying and actionable copying. The former (probative similarity) requires only the fact that the infringing work copies something from the copyrighted work; the latter (substantial similarity) requires that the copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred. The qualitative component concerns the copying of expression, rather than ideas, a distinction that often turns on the level of abstraction at which the works are compared. *See Nimmer* § 13.03[A][1]. The quantitative component generally concerns the amount of the

copyrighted work that is copied, a consideration that is especially pertinent to exact copying, *see Nimmer* § 13.03[A][2].[3] In cases involving visual works, like the pending one, the quantitative component of substantial similarity also concerns the observability of the copied work—the length of time the copied work is observable in the allegedly infringing work and such factors as focus, lighting, camera angles, and prominence. Thus, as in this case, a copyrighted work might be copied as a factual matter, yet a serious dispute might remain as to whether the copying that occurred was actionable. Since "substantial similarity," properly understood, includes a quantitative component, it becomes apparent why the concept of *de minimis* is relevant to a defendant's contention that an indisputably copied work has not been infringed. *See id.* at 13–46 & n. 92.2.

■ Third, *de minimis* might be considered relevant to the defense of fair use. One of the statutory factors to be assessed in making the fair use determination is "the *amount* and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3) (emphasis added). A defendant might contend, as the District Court concluded in this case, that the portion used was minimal and the use was so brief and indistinct as to tip the third fair use factor decisively against the plaintiff.[4]

Though the concept of *de minimis* is useful in insulating trivial types of copying from liability (the photocopied cartoon on the refrigerator) and in marking the quantitative threshold for actionable copying, *see, e.g., Vault Corp. v. Quaid Software, Ltd.*, 847 F.2d 255, 267 (5th Cir.1988) (30 characters out of 50 pages of source code held *de minimis* ), the concept is an inappropriate one to

---

**3.** The Nimmer treatise helpfully refers to exact copying of a portion of a work as "fragmented literal similarity," *see Nimmer*, § 13.03[A][2], in contrast to "comprehensive nonliteral similarity," which refers to an alleged copy that is qualitatively but not exactly similar to a copyrighted work, *id.* § 13.03[A][1]. We have endorsed that taxonomy. *See Twin Peaks Productions, Inc. v. Publications International, Ltd.*, 996 F.2d 1366, 1372 n. 1 (2d Cir.1993); *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1073 (2d Cir.1992).

**4.** Whether a use of a copyrighted work that surpasses the *de minimis* threshold of "substantial similarity" for purposes of actionable copying can nevertheless be *de minimis* for purposes of the third fair use factor is an inquiry in the class of angelic terpsichore on heads of pins. Perhaps that is why the Supreme Court has quoted approvingly Professor Latman's reference to "the partial marriage between the doctrine of fair use and the legal maxim *de minimis non curat lex*." *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 451 n. 34, 104 S.Ct. 774, 793 n. 34, 78 L.Ed.2d 574 (1984).

be enlisted in fair use analysis. The third fair use factor concerns a quantitative continuum. Like all the fair use factors, it has no precise threshold below which the factor is accorded decisive significance. If the amount copied is very slight in relation to the work as a whole, the third factor might strongly favor the alleged infringer, but that will not always be the case. *See, e.g., Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc.,* 621 F.2d 57, 59, 61–62 (2d Cir.1980) (television program's copying of portions of copyrighted film, including an eight second segment). More important, the fair use defense involves a careful examination of many factors, often confronting courts with a perplexing task. If the allegedly infringing work makes such a quantitatively insubstantial use of the copyrighted work as to fall below the threshold required for actionable copying, it makes more sense to reject the claim on that basis and find no infringement, rather than undertake an elaborate fair use analysis in order to uphold a defense.

### B. The *de minimis* Concept Applied to Defendants' Copying

■ Defendants contend that the nine instances in their television program in which portions of the poster were visible, individually and in the aggregate, were *de minimis,* in the sense that the quantity of copying (or at least the quantity of observable copying) was below the threshold of actionable copying. The parties appear to agree on the durational aspects of the copying. The segments of the program in which the poster was visible to any degree lasted between 1.86 and 4.16 seconds. The aggregate duration of all nine segments was 26.75 seconds.

The parties differ, at least in emphasis, as to the observability of what was copied. Our own inspection of a tape of the program reveals that some aspects of observability are not fairly in dispute. In the longest segment, between 4 and 5 seconds, nearly all of the poster, at least 80 percent, is visible. The camera is positioned to the right of about eight members of the audience seated on the left side of the center aisle (facing the stage), and the poster is on the wall immediately to the left of the end of the rows of two or three spectators. The minister stands to the right of the poster, partially obscuring the lower right quadrant, and a member of the audience stands to the left, partially obscuring the lower left quadrant. Roc and his wife stand farther to the left of the poster. The very top edge of the poster is not within the camera's "framing" of the scene. Since the camera focuses precisely on the members of the audience, the poster, hung to their left, is not in perfect focus, but it is so close to them that the poster is plainly observable, even though not in exact focus.[5] An observer can see that what is hung is some form of artwork, depicting a group of African–American adults and children with a pond in the background. The brevity of the segment and the lack of perfect focus preclude identification of the details of the work, but the two-dimensional aspect of the figures and the bold colors are seen in sufficient clarity to suggest a work somewhat in the style of Grandma Moses. Only the painting portion of the poster is observable; the text material and the bordering quilting cannot be discerned.

All the other segments are of lesser duration and/or contain smaller and less distinct portions of the poster.[6] However, their re-

---

**5.** The focus is such that the eight seated members of the audience who are visible and the four people standing along the wall to their left are all in clear focus. The poster is on the wall between two of these four people.

**6.** The segments are: (1) a long, wide-angle shot of the audience and a performer on the stage, with the full poster too indistinct for anything of significance to be discerned (between two and three seconds); (2) a full view of almost the entire poster, as observable as the segment described in the text, with the lower right and lower left portions partially obscured as Joey walks up the aisle (2 to 3 seconds); (3) a close-up view of the right half of the poster, with the lower right portion partially obscured by the minister, who is standing next to the poster and on whom the camera focuses (1 to 2 seconds); (4) the segment described in the text (4 to 5 seconds); (5) similar to segment (3) (3 to 4 seconds); (6) a view of the lower right quadrant, partially obscured by a person (3 to 4 seconds); (7) similar to segment (6) (3 to 4 seconds); (8) similar to segment (6) (2 to 3 seconds); (9) similar to segment (6) (1 to 2 seconds).

petitive effect somewhat reenforces the visual effect of the observable four-to-five-second segment just described.

A helpful analogy in determining whether the purpose and duration of the segments should be regarded as *de minimis* is the regulation issued by the Librarian of Congress providing for royalties to be paid by public broadcasting entities for the use of published pictorial and visual works. *See* 37 C.F.R. § 253.8 (1996) (implementing 17 U.S.C. § 118(b)). The Librarian appoints the Register of Copyrights, who serves as the director of the Copyright Office. *See* 17 U.S.C. § 701. The Librarian's regulation distinguishes between a "featured" and a "background" display, setting a higher royalty rate for the former. *Id.* § 253.8(b)(1)(i)(A), (B). Obviously the Librarian has concluded that use of a copyrighted visual work even as "background" in a television program normally requires payment of a license fee. Moreover, the Librarian has defined a "featured" display as "a full-screen or substantially full screen display for more than three seconds," *id.* § 253.8(b)(2), and a "background" display as "[a]ny display less than full-screen or substantially full-screen, or full-screen for three seconds or less," *id.* If defendants' program were to be shown on public television, plaintiff would appear to be entitled to a "background" license fee for a "less than full-screen" display.

From the standpoint of a quantitative assessment of the segments, the principal four-to-five-second segment in which almost all of the poster is clearly visible, albeit in less than perfect focus, reenforced by the briefer segments in which smaller portions are visible, all totaling 26 to 27 seconds, are not *de minimis* copying.

Defendants further contend that the segments showing any portion of the poster are *de minimis* from the standpoint of qualitative sufficiency and therefore not actionable copying because no protectable aspects of plaintiff's expression are discernible. In defendants' view, the television viewer sees no more than "some vague stylized [sic] painting that includes black people," Brief for Appellees at 18, and can discern none of Ringgold's particular expression of her subjects. That is about like saying that a videotape of the Mona Lisa shows only a painting of a woman with a wry smile. Indeed, it seems disingenuous for the defendant HBO, whose production staff evidently thought that the poster was well suited as a set decoration for the African–American church scene of a ROC episode, now to contend that no visually significant aspect of the poster is discernible. In some circumstances, a visual work, though selected by production staff for thematic relevance, or at least for its decorative value, might ultimately be filmed at such a distance and so out of focus that a typical program viewer would not discern any decorative effect that the work of art contributes to the set. But that is not this case. The painting component of the poster is recognizable as a painting, and with sufficient observable detail for the "average lay observer," *see Rogers v. Koons,* 960 F.2d 301, 307 (2d Cir.1992) (internal quotation omitted), to discern African–Americans in Ringgold's colorful, virtually two-dimensional style. The *de minimis* threshold for actionable copying of protected expression has been crossed.[7]

## II. Fair Use

The District Court upheld the defendants' fair use defense after considering the four non-exclusive factors identified in 17 U.S.C. § 107. It relied primarily on two district court opinions, *Amsinck v. Columbia Pictures Industries, Inc.,* 862 F.Supp. 1044 (S.D.N.Y.1994), and *Mura v. Columbia Broadcasting System, Inc.,* 245 F.Supp. 587 (S.D.N.Y.1965).[8] Concerning the first fac-

---

7. The District Court implicitly reached this same conclusion since it grounded its ruling on the fair use defense, a defense that would be reached only if the threshold of actionable copying had been crossed.

8. Whether or not the cases relied on by the District Court were correctly decided, a matter we need not determine, they are distinguishable

in important respects. First, both *Mura* and *Amsinck* held that televising or filming the copyrighted items (hand puppets and a teddy bear mobile, respectively) did not constitute making a copy. However, *Mura* was decided before the 1976 Act afforded copyright proprietors a display right, *see* 17 U.S.C. § 106(5), and *Amsinck,* though decided under the 1976 Act, did not consider a display right. Second, both decisions

tor—purpose and character of the use—the Court acknowledged that defendants' use was commercial, but thought this circumstance was "undercut" by the fact that the defendants did not use the poster to encourage viewers to watch the ROC episode and did not try to "exploit" Ringgold's work. *Ringgold v. Black Entertainment Television,* No. 96 Civ. 0290, 1996 WL 535547, *3 (S.D.N.Y. Sept. 19, 1996). The Court acknowledged that the second factor—nature of the copyrighted work—favored Ringgold in view of the imaginative nature of her artwork.

The Court considered the third factor—amount and substantiality of the portion used in relation to the entire work—to favor the defendants because the segments of the program in which the poster is visible are brief, in some only a portion is seen, and in those showing nearly all the poster, it is not in exact focus.

The Court considered the fourth factor—effect of the use upon the potential market for the work—also to favor the defendants. Noting that the television episode cannot be considered a substitute for the poster, Judge Martin predicted "little likelihood" of any adverse impact on poster sales. *Id.,* 1996 WL 535547 at *4. In addition, he observed that Ringgold did not claim that her ability to license the poster "has been negatively impacted by the defendants' use in the four years" since the episode was aired. *Id.* Concluding that defendants' use "had little or no effect on Ringgold's potential market for her work," *id.,* he granted summary judgment in their favor, sustaining their fair use defense.

In reviewing the grant of summary judgment, we note preliminarily that the District Court gave no explicit consideration to whether the defendants' use was within any of the categories that the preamble to section 107 identifies as illustrative of a fair use, or even whether it was similar to such categories. Though the listed categories—criticism, comment, news reporting, teaching, scholarship, and research, *see* 17 U.S.C. § 107—have an " 'illustrative and not limitative' " function, *see Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 577, 114 S.Ct. 1164, 1170, 127 L.Ed.2d 500 (1994) (quoting 17 U.S.C. § 101),[9] and the four factors should be considered even if a challenged use is not within any of these categories, *see Pacific and Southern Co. v. Duncan,* 744 F.2d 1490, 1495 (11th Cir.1984), the illustrative nature of the categories should not be ignored. As the Supreme Court's recent and significant fair use opinion in *Campbell* observes, "The enquiry [concerning the first fair use factor] may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like...." *Campbell,* 510 U.S. at 578–79, 114 S.Ct. at 1171.

1. *First factor.* Considering the first fair use factor with the preamble illustrations as a "guide[ ]," *id.,* we observe that the defendants' use of Ringgold's work to decorate the set for their television episode is not remotely similar to any of the listed categories. In no sense is the defendants' use " 'transformative,' " *id.* at 579, 114 S.Ct. at 1171 (quoting Pierre N. Leval, *Toward a Fair Use Standard,* 103 Harv. L.Rev. 1105, 1111 (1990)). In *Campbell,* Justice Souter explained a

discussed the fair use defense as dictum, after finding lack of copying. *See Mura,* 245 F.Supp. at 590; *Amsinck,* 862 F.Supp. at 1048 ("defendants might still be entitled to a fair use defense"). Third, at least in *Mura,* the puppets were used functionally and for a somewhat educational purpose in the Captain Kangaroo television program. By contrast, Ringgold's work was used by defendants for precisely the decorative purpose that was a principal reason why she created it. Finally, both decisions regarded the fourth fair use factor as of primary importance and weighted the factor heavily against the plaintiffs. However, the erstwhile primacy of the fourth factor, *see, e.g., Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233–34, has been considerably modulated by the requirement announced by the

Supreme Court in *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), that "[a]ll [four factors] are to be explored, and the results weighed together, in light of the purposes of copyright," *id.* at 578, 114 S.Ct. at 1171, and we have recently recognized the existence of a licensing market as relevant to the fourth factor analysis, *see American Geophysical,* 60 F.3d at 929–31.

9. Section 107 states that a fair use for purposes "such as" the six listed categories is not an infringement, and section 101 states that "[t]he terms 'including' and 'such as' are illustrative and not limitative." 17 U.S.C. §§ 101, 107.

"transformative" use that would tip the first factor toward a defendant:

> The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely "supersede[s] the objects" of the original creation, *Folsom v. Marsh*, [9 F. Cas. 342, 348 (C.C.Mass.1841) (No. 4,901)]; accord, *Harper & Row, [Publishers, Inc. v. Nation Enterprises]*, 471 U.S. [539, 562, 105 S.Ct. 2218, 2231–32, 85 L.Ed.2d 588 (1985) ] ("supplanting" the original), or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message. . . .

510 U.S. at 579, 114 S.Ct. at 1171.

The defendants have used Ringgold's work for precisely a central purpose for which it was created—to be decorative.[10] Even if the thematic significance of the poster and its relevance to the ROC episode are not discernible, the decorative effect is plainly evident. Indeed, the poster is the only decorative artwork visible in the church hall scene. Nothing that the defendants have done with the poster "supplant[s]" the original or "adds something new." The defendants have used the poster to decorate their set to make it more attractive to television viewers precisely as a poster purchaser would use it to decorate a home.

■ In considering whether a visual work has been "supplant[ed]" by its use in a movie or a television program, care must be taken not to draw too close an analogy to copying of written works. When all or a substantial portion of text that contains protectable expression is included in another work, solely to convey the original text to the reader without adding any comment or criticism, the second work may be said to have supplanted the original because a reader of the second work has little reason to buy a copy of the original. Although some books and other writings are profitably reread, their basic market is the one-time reader. By contrast, visual works are created, and sold or licensed, usually for repetitive viewing. Thus, the fact that the episode of ROC does not supplant the need or desire of a television viewer to see and appreciate the poster (or the original) again and again does not mean that the defendants' use is of a "purpose and character" that favors fair use. Indeed, unauthorized displays of a visual work might often increase viewers' desire to see the work again. Nevertheless, where, as here, the purpose of the challenged use is, at a minimum, the same decorative purpose for which the poster is sold, the defendants' use has indeed "superseded the *objects*" of the original, *see Folsom*, 9 F. Cas. at 348 (emphasis added), and does not favor fair use. Of course, no one would buy a videotape of the ROC episode as a substitute for the poster, but the challenged use need not supplant the original itself, only, as Justice Story said, the "objects" of the original.

It is not difficult to imagine a television program that uses a copyrighted visual work for a purpose that heavily favors fair use. If a TV news program produced a feature on Faith Ringgold and included camera shots of her story quilts, the case for a fair use defense would be extremely strong.[11] The same would be true of a news feature on the High Museum that included a shot of "Church Picnic." *See Italian Book Corp. v. American Broadcasting Cos.*, 458 F.Supp. 65 (S.D.N.Y.1978) (fair use defense upheld for TV newscast of street festival that included copyrighted song).[12] However, it must be

---

10. Of course, the creation of visual works serves other, often more important, purposes such as illuminating human understanding, providing inspiration, or provoking thought. Ringgold's work, in telling and illustrating an informative story, might well serve these purposes, but it also significantly serves a decorative purpose.

11. We hesitate to say "conclusive" because even existing technological advances, much less those in the future, create extraordinary possibilities. For example, if the news program included a direct shot of an entire story quilt (whether origi-

nal or poster reproduction), well lit and in clear focus, a viewer so inclined could tape the newscast at home, scan the tape, and with digital photographic technology, produce a full size copy of the original, thereby securing an attractive "poster"-like wall-hanging without paying the $20 poster fee. A news program that recommended this technique would be a weak candidate for fair use.

12. The Patry treatise on fair use suggests that this case is better grounded, not on fair use, but as an example of "excused innocent infringe-

recognized that visual works are created, in significant part, for their decorative value, and, just as members of the public expect to pay to obtain a painting or a poster to decorate their homes, producers of plays, films, and television programs should generally expect to pay a license fee when they conclude that a particular work of copyrighted art is an appropriate component of the decoration of a set.

The District Court's consideration of the first fair use factor was legally flawed in its failure to assess the decorative purpose for which defendants used the plaintiff's work. Instead, the Court tipped the first factor against the plaintiff because the presence of the poster was "incidental" to the scene and the defendants did not use the poster to encourage viewers to watch the ROC episode. The first point could be said of virtually all set decorations, thereby expanding fair use to permit wholesale appropriation of copyrighted art for movies and television. The second point uses a test that makes it far too easy for a defendant to invoke the fair use defense.[13]

2. *Second factor.* The District Court accepted the plaintiff's contention that the second fair use factor weighs in her favor because of the creative nature of her work.

■ 3. *Third factor.* Though we have earlier noted that the *de minimis* concept is inappropriate for a fair use analysis, since a copying that is *de minimis* incurs no liability, without the need for an elaborate fair use inquiry, the third fair use factor obliges a court to consider the amount and substantiality of the portion used, whenever that portion crosses the *de minimis* threshold for actionable copying. The District Court properly considered the brevity of the intervals in

which the poster was observable and the fact that in some segments only a portion of the poster and the nearly full view was not in precise focus.[14] Our own viewing of the episode would incline us to weight the third factor less strongly toward the defendants than did Judge Martin, but we are not the fact-finders, and the fact-finding pertinent to each fair use factor, under proper legal standards, is for the District Court, although the ultimate conclusion is a mixed question of law and fact, *Harper & Row,* 471 U.S. at 560, 105 S.Ct. at 2230, subject to *de novo* review, *New Era Publications International, ApS v. Carol Publishing Group,* 904 F.2d 152, 155 (2d Cir.1990).

■ Even if the third factor favors the defendants, courts considering the fair use defense in the context of visual works copied or displayed in other visual works must be careful not to permit this factor too easily to tip the aggregate fair use assessment in favor of those whom the other three factors do not favor. Otherwise, a defendant who uses a creative work in a way that does not serve any of the purposes for which the fair use defense is normally invoked and that impairs the market for licensing the work will escape liability simply by claiming only a small infringement.

4. *Fourth factor.* The fourth fair use factor is "the effect of the use upon the *potential* market for or value of the copyrighted work." 17 U.S.C. § 107(4) (emphasis added). "It requires courts to consider not only the extent of market harm caused by the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in substantially adverse impact on the potential market for the original.'" *Campbell,* 510

ment." *See* William F. Patry, *The Fair Use Privilege in Copyright Law* 484 (2d ed.1995). Perhaps the author prefers to defeat such claims on the threshold ground that no actionable infringement occurred, rather than subject the news-gathering defendant to the vagaries of the fair use defense.

13. To the extent that the defendants' good faith is relevant, *see Rogers,* 960 F.2d at 309, the fact-finder is entitled to consider that someone, likely a member of BET's production staff, cropped the poster before framing it so as to omit the legend identifying the poster with the High Museum.

An available inference is that the production staff, if responsible, wanted the viewers to believe that the set was decorated with an original painting, rather than a poster reproduction.

14. At trial, plaintiff will be entitled to show the fact-finder the master tape that was used to air the ROC episode, thereby avoiding whatever lack of focus is attributable from the inevitable degradation that occurred in making the videotape copies submitted to the District Court and to this Court.

U.S. at 590, 114 S.Ct. at 1177 (quoting *Nimmer* § 13.05[A][4] (at 13–187 in 1997 edition)). Ringgold contends that there is a potential market for licensing her story quilts, Complaint ¶ 17, and stated in an affidavit that in 1995 she earned $31,500 from licensing her various artworks and that she is often asked to license her work for films and television. Affidavit of Faith Ringgold ¶¶ 13, 14. Specifically, she avers that in 1992 she was asked to license use of the "Church Picnic" poster by the producers of another TV sitcom and declined because of an inadequate price and inadequate artist's credit. *Id.* ¶ 15.

We have recognized the danger of circularity in considering whether the loss of potential licensing revenue should weight the fourth factor in favor of a plaintiff. *See American Geophysical,* at 929 n. 17, 931. Since the issue is whether the copying should be compensable, the failure to receive licensing revenue cannot be determinative in the plaintiff's favor. *See id.* at 931. We have endeavored to avoid the vice of circularity by considering "only traditional, reasonable, or likely to be developed markets" when considering a challenged use upon a potential market. *See id.* at 930; *Nimmer* § 13.05[A][4], at 13–189. Ringgold's affidavit clearly raises a triable issue of fact concerning a market for licensing her work as set decoration. She is not alleging simply loss of the revenue she would have earned from a compensated copying; she is alleging an "exploitation of the copyrighted material without paying the *customary* price." *See Harper & Row,* 471 U.S. at 562, 105 S.Ct. at 2231 (emphasis added).[15]

█ The District Court's assessment of the fourth factor in favor of the defendants was legally flawed. The Court relied primarily on the fact that the ROC episode had little likelihood of adversely affecting poster sales and that Ringgold had not claimed that her ability to license the poster had been "negatively impacted." 1996 WL 535547, at *4. The first consideration deserves little weight against a plaintiff alleging appropriation without payment of a customary licensing fee.[16] The second consideration confuses lack of one item of specific damages with lack of adverse impact on a potential market. *See Nimmer* § 13.05[A][4], at 13–187. Ringgold is not required to show a decline in the number of licensing requests for the "Church Picnic" poster since the ROC episode was aired. The fourth factor will favor her if she can show a "traditional, reasonable, or likely to be developed" market for licensing her work as set decoration. Certainly "unrestricted and widespread conduct of the sort engaged in by the defendant[s] ... would result in substantially adverse impact on the potential market for [licensing of] the original." *Campbell,* 510 U.S. at 590, 114 S.Ct. at 1177 (internal quotation omitted). Particularly in view of what Ringgold has averred and is prepared to prove, the record on the fourth fair use factor is inadequate to permit summary judgment for the defendants. *See id.* at 593–94, 114 S.Ct. at 1178–79.

Conclusion

For all of these reasons, plaintiff's copyright infringement claim must be returned to the District Court to afford an opportunity for further development of the record and a sensitive aggregate assessment by the factfinder of the fair use factors in light of the applicable legal principles. Upon remand, the Court should give renewed consideration to plaintiff's claim under the New York Artists' Authorship Rights Act.[17] However, be-

---

15. The *amicus curiae* brief for the Artists Rights Society, Inc. and the Picasso Administration strongly indicates evidence of licensing of artistic works for film and television set decoration, evidence that plaintiff is entitled to present at trial.

16. Even if the unauthorized use of plaintiff's work in the televised program might increase poster sales, that would not preclude her entitlement to a licensing fee. *See DC Comics,* 696 F.2d at 28.

17. The New York Artists' Authorship Rights Act provides as follows:

1. [N]o person other than the artist or a person acting with the artist's consent shall knowingly display in a place accessible to the public or publish a work of fine art or limited edition multiple of not more than three hundred copies by that artist or a reproduction thereof in an altered, defaced, mutilated or modified form if the work is displayed, published or reproduced as being the work of the artist, or under circumstances under which it

cause Ringgold has not challenged the dismissal of her preempted unfair competition claim, we affirm the District Court's dismissal of that claim.

The judgment of the District Court is reversed, and the case is remanded.

would reasonably be regarded as being the work of the artist, and damage to the artist's reputation is reasonably likely to result therefrom....

2.(a) [T]he artist shall retain at all times the right to claim authorship, or, for just and valid reason, to disclaim authorship of such work. The right to claim authorship shall include the right of the artist to have his or her name appear on or in connection with such work as the artist.

....

4.(a) An artist aggrieved under subdivision one or subdivision two of this section shall have a cause of action for legal and injunctive relief.

N.Y. Arts & Cult. Aff. Law § 14.03 (McKinney Supp.1995). Ringgold claims that the defendants violated her statutory rights because they did not credit her as the creator of the story quilt. Though the defendants argued on various grounds that the statute does not apply to the facts alleged, the District Judge decided not to exercise supplemental jurisdiction over the claim. By our remand, we express no view as to the merits of this claim or of defendants' defenses.