Jorge Antonio SANDOVAL,
Plaintiff–Appellant,

v.

NEW LINE CINEMA CORP., New Line
Productions, Inc. and New Line Distri-
bution, Inc., Defendants–Appellees.

Docket 97–9175.

United States Court of Appeals,
Second Circuit.

Argued May 20, 1998.

Decided June 24, 1998.

L.Donald Prutzman, Stecher, Jaglom &
Prutzman, New York City, for Plaintiff–Ap-
pellant.

Stephen F. Huff, Pryor, Cashman, Sher-
man & Flynn, New York City (Tom J. Fer-
ber, Jeff Sanders, of counsel), for Defen-
dants–Appellees.

Before: MESKILL, KEARSE, Circuit
Judges, and TELESCA, District Judge.*

TELESCA, District Judge.

### *INTRODUCTION*

Jorge Antonio Sandoval appeals from the
judgment of the United States District Court
for the Southern District of New York (Sid-
ney H. Stein, Judge) granting defendants'

---

* The Honorable Michael A. Telesca, United States District Court for the Western District of New York, sitting by designation.

motion for summary judgment and dismissing Sandoval's copyright infringement action. Sandoval brought suit claiming that the defendants, producers and distributors of the motion picture "Seven," used ten of his copyrighted photographs in that movie without his permission. Because we hold that defendant's use of Sandoval's pictures was *de minimis*, we affirm the judgment of the District Court.

## BACKGROUND

Jorge Antonio Sandoval is an artist and photographer who lives and works in Southern California. Between 1991 and 1994, he created a series of 52 untitled, and highly unusual black and white self-portrait studies. The series contains, *inter alia*, photographs of Sandoval with his face tightly wrapped with wire; with his face covered by soap bubbles; and lying on what appears to be a bed of thorns. It is undisputed that Sandoval owns the copyrights to these photographs, which were never published nor publicly shown.

In 1995, New Line Cinema Corp. produced and commenced distribution of the motion picture "Seven". The movie is based upon a fictitious story of a depraved photographer who commits seven torturous murders, each of which is designed to evoke or represent one of the traditional seven deadly sins recognized in the doctrines of the Roman Catholic Church.

In one scene, approximately one hour and sixteen minutes into the movie, two investigators search the photographer's apartment for evidence linking him to the murders. On the back wall of the apartment is a large light-box with a number of photographic transparencies attached to it. The parties agree, for

purposes of summary judgment, that ten of the transparencies affixed to the light box are reproductions of Sandoval's self-portraits.

At approximately one hour and seventeen minutes into the movie, the light box is turned on, allowing light to pass through the non-opaque portions of the transparencies posted on the box. During the next minute and a half, the light box and Sandoval's pictures, or portions of each, are briefly visible in eleven different camera shots. The longest uninterrupted view of the light box lasts six seconds, but the box is otherwise visible, in whole or in part, for a total of approximately 35.6 seconds. The photographs never appear in focus, and except for two of the shots, are seen in the distant background, often obstructed from view by one of the actors. In these two shots, figures in the photographs are barely discernable, with one shot lasting for four seconds and the other for two seconds. Moreover, in one of the shots, after one and a half seconds, the photograph is completely obstructed by a prop in the scene.

## *DISCUSSION*

### I. *The Proceedings Below.*

The District Court held that New Line Cinema's use of Sandoval's copyrighted photographs constituted a fair use of that material under § 107 of the Copyright Act (codified at 17 U.S.C. § 107), and therefore granted defendants' motion for summary judgment and dismissed the complaint. In making that determination, the District Court considered four factors which are set forth in § 107 of the Copyright Act as relevant, non-exclusive considerations in determining whether or not the use of copyrighted material is a fair use.[1] Specifically, the

---

1. Section 107 of the Copyright Act provides in relevant part that:

   the fair use of a copyrighted work, including such use by reproduction in copies or phono records or by any other means specified ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

   (1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes;
   (2) the nature of the copyrighted work;
   (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
   (4) the effect of the use upon the potential market for or value of the copyrighted work. The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is

Court examined: (1) the purpose and character of the use of the photographs; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect upon the potential market for the copyrighted photographs. *Sandoval v. New Line Cinema Corp.*, 973 F.Supp. 409, 412–414 (S.D.N.Y.1997).

In determining how the four factors should be evaluated, the District Court relied heavily on the analysis employed in *Ringgold v. Black Entertainment Television, Inc.*, 1996 WL 535547 (S.D.N.Y. Sept. 19, 1996), a similar case involving an infringement claim against the producers of a television program in which an artist's copyrighted artwork was used as set dressing without her permission. *Ringgold,* however, was subsequently reversed by this court on grounds that the District Court had improperly analyzed two of the four factors set forth in § 107. *Ringgold v. Black Entertainment Television,* 126 F.3d 70 (2nd Cir.1997). Sandoval contends on appeal that since the District Court below utilized the same flawed analysis as the District Court in *Ringgold,* this Court should reverse the judgment below and direct the District Court to grant summary judgment to the plaintiff on the issue of liability.

In *Ringgold,* this Court held that a District Court's failure to properly weigh two of the four factors set forth in § 107 warranted remand for proper examination of those factors under the correct legal standards. *Ringgold,* 126 F.3d at 78–81. We also stated, however, that where the unauthorized use of a copyrighted work is *de minimis,* no cause of action will lie for copyright infringement, and determination of a fair use claim is unnecessary. *Ringgold,* 126 F.3d at 76 (where "the allegedly infringing work makes such a quantitatively insubstantial use of the copyrighted work as to fall below the threshold required for actionable copying, it makes more sense to reject the claim on that basis and find no infringement, rather than undertake an elaborate fair use analysis...").

■ · In the instant case, the District Court decided the fair use issue without first ascertaining whether or not the use of the copy-

righted material was *de minimis.* We believe it was error to resolve the fair use claim without first determining whether the alleged infringement was *de minimis.* However, because the claimed copying is *de minimis* as a matter of law, we affirm the judgment of the District Court.

II. The Infringement of Plaintiff's Copyrighted Photographs is *De Minimis.*

■ To establish that the infringement of a copyright is *de minimis,* and therefore not actionable, the alleged infringer must demonstrate that the copying of the protected material is so trivial "as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying." *Ringgold,* 126 F.3d at 74 (citing 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[A] at 13–27). In determining whether or not the allegedly infringing work falls below the quantitative threshold of substantial similarity to the copyrighted work, courts often look to the amount of the copyrighted work that was copied, as well as, (in cases involving visual works), the observability of the copyrighted work in the allegedly infringing work. *Ringgold,* 126 F.3d at 75. Observability is determined by the length of time the copyrighted work appears in the allegedly infringing work, and its prominence in that work as revealed by the lighting and positioning of the copyrighted work. *Ringgold,* 126 F.3d at 75. Like the analysis of a fair use claim, an inquiry into the substantial similarity between a copyrighted work and the allegedly infringing work must be made on a case-by-case basis, as there are no bright-line rules for what constitutes substantial similarity. *See Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (analysis of fair use claim must be made on case-by-case basis); *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960)(test for infringement of a copyright is necessarily "vague" and determinations must be made "*ad hoc* ").

---

made upon consideration of all the above factors.

· 17 U.S.C. § 107 (1994).

We have reviewed a video copy of the relevant portions of the alleged infringing work, and find that the defendants' copying of Sandoval's photographs falls below the quantitative threshold of substantial similarity. Unlike the artwork at issue in *Ringgold*, where the artwork was "clearly visible" and "recognizable as a painting ... with sufficient observable detail for the 'average lay observer' ... to discern African–Americans in Ringgold's colorful, virtually two-dimensional style," *Ringgold*, 126 F.3d at 77, Sandoval's photographs as used in the movie are not displayed with sufficient detail for the average lay observer to identify even the subject matter of the photographs, much less the style used in creating them.

The photographs are displayed in poor lighting and at great distance. Moreover, they are out of focus and displayed only briefly in eleven different shots. Unlike *Ringgold*, in which the court found that brief but repeated shots of the poster at issue reinforced its prominence, the eleven shots here have no cumulative effect because the images contained in the photographs are not distinguishable. In short, this is the type of case the *Ringgold* court anticipated when it observed that "[i]n some circumstances, a visual work, though selected by production staff for thematic relevance, or at least for its decorative value, might ultimately be filmed at such distance and so out of focus that a typical program viewer would not discern any decorative effect that the work of art contributes to the set." *Ringgold*, 126 F.3d at 77. Because Sandoval's photographs appear fleetingly and are obscured, severely out of focus, and virtually unidentifiable, we find the use of those photographs to be *de minimis*.

## CONCLUSION

For the aforementioned reasons, we find that defendants' use of Sandoval's copyrighted material was *de minimis* and affirm the judgment of the District Court.