Barbara BROWN, Plaintiff,

v.

Patricia A. McCORMICK,
et al., Defendants.

No. CIV. L–96–3450.

United States District Court,
D. Maryland.

Oct. 8, 1998.

Johnny M. Howard, Baltimore, MD, for Plaintiff.

Kathryn A. Young, Beverly Hills, CA, Vicki L. Dexter, Baltimore, MD, for Defendants.

## MEMORANDUM

LEGG, District Judge.

### I. Introduction

This suit, alleging copyright infringement and related causes of action, arises out of a dispute over the use of plaintiff's quilt block patterns during the filming and merchandising of the motion picture (the "movie") *How to Make an American Quilt.* The parties have filed cross-motions for summary judgment, as well as several other, non-dispositive motions. For the reasons stated below, the Court shall GRANT IN PART the defendants' motion with respect to Ms. Brown's state law claims, shall otherwise DENY the motions for summary judgment, and shall dispose of the remaining motions as described.

### II. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be entered in favor of a moving party when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Kimmell v. Seven Up Bottling Co., Inc.,* 993 F.2d 410, 412 (4th Cir.1993). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, when applied to the substantive law, the outcome of the litigation is affected. *Strauss v. Peninsula Reg'l Med. Ctr.,* 916 F.Supp. 528, 530 (D.Md. 1996). To satisfy the requirements for summary judgment, a moving party is not required to establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party need only show the "absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548.

Rule 56(e) states further that the non-moving party cannot rest upon the pleadings but

> must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). To establish the existence of a genuine issue of material fact, the non-moving party must come forward with "significant probative evidence." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 (quoting *First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Specific facts in evidence must support the claims and demonstrate that a genuine issue for trial exists. *Kimsey v. Myrtle Beach,* 109 F.3d 194, 195 (4th Cir.1997). "Merely colorable" or "not significantly probative" evidence is insufficient to withstand summary judgment. *Thompson Everett, Inc. v. National Cable Advertising, L.P.,* 57 F.3d 1317, 1323 (4th Cir.1995). In *Thompson Everett,* the Fourth Circuit made clear that the showing required of the non-moving party is a substantial one:

> While it is axiomatic that Rule 56 must be used carefully so as not to improperly foreclose trial on genuinely disputed, material facts, the mere existence of some disputed facts does not require that a case go to trial. The disputed facts must be material to an issue necessary for the proper resolution of the case, and the *quality and quantity of the evidence* offered to create a question of fact *must be adequate to support a jury verdict.*

*Id.* at 1323 (emphasis added).

### III. Background

#### A. The Movie Project

In 1994 and 1995, Defendants Amblin' Entertainment, Inc. ("Amblin"), and Universal City Studios, Inc. ("Universal") (collectively,

"the studio"), were producing a movie entitled *How to Make an American Quilt*, based on a 1991 Whitney Otto novel of the same name. Both the novel and the movie concern a group of women quilters and their relationships. As a result, the story frequently refers to quilts and quilting. In fact, one particular quilt, entitled "Where Love Resides," serves as the unifying plot device, as the main group of characters undertakes to create this new quilt as a wedding present for the character Finn.

As defendant Patricia McCormick would later relate in her behind-the-scenes book, *Pieces of an American Quilt*, "[t]he original script called for five quilts, but gave very little description of what they were to look like." (Pl.'s Mot. Summ. J. Exh. E, Patty McCormick, *Pieces of an American Quilt* 11 (1996).) Two of these five quilts are at issue in this case. The first is an "African–American story quilt" entitled "The Life Before." One of the characters, Anna, had inherited this quilt as a family heirloom. The movie script (again, based on Otto's novel) described "The Life Before" as

> laid out in fifteen squares which are filled with scenes in native, appliqued forms. We see angels blowing trumpets, blazing suns, Adam and Eve and the snake, elephants and giraffes, African warriors doing battle, men and women in chains inside a ship on a choppy sea ... a scene with a black bird flying over a man and a woman holding hands.

(McCormick Decl. at ¶ 2; Pl.'s Mot. Summ. J. Exh. F, Letter from McCormick to Brown of 9/12/1994 at 2.) All the parties agree that the description of this quilt bears a notable resemblance to the "Bible Quilts" that a freed slave named Harriet Powers created in the late 1800's. (*See* Pl.'s Mot. Summ. J. Exh. C.) [1] In fact, Whitney Otto had been aware of the Harriet Powers "Bible quilts" at the time that she wrote the novel. (*See* Pl's Mot. Summ J. Exh. A., McCormick Decl. at ¶ 10.) The Harriet Powers "Bible Quilts" exhibit what the parties term a "folk-art" style, with

simple, primitive drawings of human figures and scenes.

The second quilt at issue here is the central "Where Love Resides" quilt mentioned above; the dispute in this case concerns in particular one of the quilt's sixteen component blocks. As this discussion will explain, "quilt block patterns," "quilt blocks," "quilt tops," and "quilts" are not synonymous. A "quilt block pattern" is a design template, drawn on paper or other material, from which a quilter may trace, cut, and sew together pieces of fabric or other material to create a "quilt block." Groups of "quilt blocks," organized and sewn together, typically with borders or other connective material, form a "quilt top." The "quilt top" is itself the artistically decorated top cover of a "quilt."

Each of the movie's seven supporting characters contributes a quilt block to the "Where Love Resides" quilt top; the quilt blocks represent something of personal significance to the contributors. Anna, the character who owns "The Life Before" quilt, contributes the "Marriage" block to "Where Love Resides." The "Marriage" block is essentially a duplication of the "Wedding" block in "The Life Before," [2] which depicts "a scene with a black bird flying over a man and a woman holding hands." (*See* McCormick, *Pieces of an American Quilt* 20.) The Harriet Powers "Bible Quilts" also included blocks depicting two human figures with a large bird overhead. (*See* Pl.'s Mot. Summ. J. Exh. C.) As explained more fully below, the parties dispute to what extent the "Marriage" block in "Where Love Resides" duplicates the "Wedding" block in "The Life Before." The "Marriage" block that the studio used in the movie differs from the "Wedding" block most notably in two respects: (i) it reverses the alignment of the bird figure, showing it pointing downward instead of upward; and (ii) it includes a figure of the Sun not present on the "Wedding" block.

---

**1.** The Harriet Powers "Bible Quilts," which the Smithsonian Museum holds in its collection, are in the public domain.

**2.** The parties are inconsistent in referring to these two quilt blocks, sometimes reversing or

conflating the identification of both. For the sake of convenience in this opinion, this Court will refer to the block in "The Life Before" as the "Wedding" block, and will refer to the block in "Where Love Resides" as the "Marriage" block.

## B. Ms. McCormick's and Ms. Brown's Involvement

As pre-production for the movie proceeded in August 1994, the studio retained Ms. McCormick, then President of the Southern California Council of Quilt Guilds, as a technical consultant. (Defs.' Cross–Mot. Summ. J. Exh. C, Decl. Patricia A. McCormick ("McCormick Decl.") at ¶ 2.) Prior to Ms. McCormick's involvement, the studio art department had attempted to create quilt patterns for the movie using the descriptions in the script. As Ms. McCormick would later explain, however, the studio artists "knew practically nothing about quilts," and their designs showed this lack of knowledge. (*See* McCormick, *Pieces of an American Quilt* 10.) Accordingly, the studio asked Ms. McCormick to work with the studio art department in designing or acquiring the quilts, as well as in assisting on other technical aspects of the production. (*Id.* at 11.)

Ms. McCormick became concerned with the design for "The Life Before" quilt. Although the studio art department had attempted some designs for this quilt, the designs had proven unsatisfactory. As Ms. McCormick would later relate,

> [t]he art department struggled with ["The Life Before"] quilt. Their only reference was the Smithsonian Museum Bible Quilt by Harriet Powers, and everything they designed looked just like that quilt. These five men in the art department who didn't sew or quilt were also not African–American. This quilt was just not coming together for them, and we didn't have a lot of time.

(McCormick, *Pieces of an American Quilt* 26.)

In September 1994, Ms. McCormick became aware of the work of Ms. Brown, an African American quilter living in Maryland. Ms. McCormick telephoned Ms. Brown to propose that Ms. Brown design patterns for the fifteen quilt blocks of "The Life Before" quilt. (McCormick Decl. at ¶ 8.) Ms. McCormick explained in the telephone conversation "that the production team wanted a quilt

similar to the style of Harriet Powers'[s] Bible Quilt. . . . [but] the quilt could not duplicate Powers'[s] Bible Quilts, because they were cultural icons which would be recognized if copied." (*Id.*) On September 12, Ms. McCormick sent a follow-up letter, reiterating that "[w]hat we are looking for is a design similar to [the Harriet Powers "Bible Quilt,"] but it can't look like the Bible Quilt." (Pl.'s Mot. Summ. J. Exh. F.) Although the letter included the pages of the script including the description of "The Life Before" quilt, Ms. McCormick conceded that the description there was "vague." (*Id.*)

Ms. Brown and Ms. McCormick spoke again by telephone the following day. Ms. Brown asserts that in this conversation, Ms. McCormick informed her that the studio intended to create two copies of "The Life Before" from Ms. Brown's quilt block patterns; the production team would then age the two quilts differently for use in scenes in the movie portraying different time periods. (Pl.'s Mot. Summ. J. at 3; *see also* Am. Compl. [Docket No. 41] at ¶ 15.)[3] Ms. Brown also asserts that in this conversation, she informed Ms. McCormick that she would design the fifteen quilt block patterns, "on condition that she would retain the copyright in all her designs," for $750. (Pl.'s Mot. Summ. J. at 3.)

Three days later, Ms. Brown sent Ms. McCormick the first five quilt block patterns using a procedure that would become standard for the remaining quilt block patterns. (*See* Pl.'s Mot. Summ. J. Exh. G.) Ms. Brown faxed to Ms. McCormick copies of the quilt block patterns divided in fourths, along with directions explaining their reassembly. On the bottom right quarter of each of the complete quilt block patterns, Ms. Brown added the notation "© 1994 Barbara Brown." (*See id.*)

Ms. McCormick took these first few designs to the studio, who "loved" them. (*See* McCormick, *Pieces of an American Quilt* 26.) On September 21, Ms. McCormick

---

**3.** This Court will frequently refer to Ms. Brown's papers when attributing statements to her. Ms. Brown, herself an attorney, proceeded *pro se* in this case until April 1998, when Ms. Brown retained counsel. Because Ms. Brown holds an

unchallenged federal bar number, however, the Court has continued to accept papers that Ms. Brown has authored with the acquiescence of her named counsel.

called Ms. Brown and left an answering machine message; Ms. Brown saved the tape. (Am. Compl. Exhs. AA & BB (recording of answering machine message and transcription).) In the message, Ms. McCormick said:

Barbara, it's Patty McCormick from California.... I presented your designs yesterday to the studio, and they loved them, overwhelmingly approved them, said go ahead, finish them ... follow the script on the blocks that you need and use your best judgment for the others and ... *they approved the fact that you may retain design rights to it* and approved the cost of fifty dollars a block for the design work.... we'll of course age this quilt. *One has to ... look like about eighty years old. One has to look like about 110 years old ... or 140 years old.*

*(Id.)* (emphasis added). Some weeks later, Ms. McCormick mailed to Ms. Brown a letter agreement. (Pl.'s Mot. Summ. J. Exh. J.) The agreement, which Ms. McCormick had signed and dated, stated in part:

*As we discussed on the telephone*, I will pay you $750.00 to design fifteen 16″ (finished) blocks in the style of African American story quilts, circa 1850. Several blocks are described in the script ... and these descriptions must be replicated in your designs. You may use your own judgment [sic] in creating the remaining blocks to best complete the story. *With your permission, two quilts will be made using your designs* and they will be sold to Universal Studios/ Amblin Productions for use in the film, "How To Make An American Quilt." Final design approval of these two quilts will be made by the studio.

As we agreed, *you will retain all creative rights to the original designs.*

By signing and returning the enclosed copy of this letter, you agree to the terms set forth and give permission to use your designs in this project.

*(Id.)* (emphasis added). Ms. Brown signed, dated, and returned the agreement to Ms. McCormick.

Over the following two months, Ms. Brown continued to send the completed quilt block patterns to Ms. McCormick using the described method of faxing the quilt block patterns in parts. On each of the patterns, Ms. Brown included the notation "© 1994 Barbara Brown." Ms. McCormick selected fabrics, colors, and textures for the designs, and took the patterns to a third woman, Dora Simmons, who primarily assembled the quilt blocks. (*See* Defs.' Mot. Summ. J. Exh. F at ¶¶ 20–22; McCormick Decl. at ¶¶ 11–13.) Ms. Simmons arranged the quilt blocks into quilt top and added a lattice and border. (*See* McCormick Decl. at ¶¶ 11–12.)

In December, after Ms. Brown inquired about her payment, Ms. McCormick called and left a recorded message, which Ms. Brown again saved. (Am. Compl. Exhs. AA & CC (recording of answering machine message and transcription).) In the message, Ms. McCormick explained that the delay resulted because, in order to preserve Ms. Brown's design rights, the studio would only allow Ms. McCormick to bill the studio for "the finished product." *(Id.)* At last, on March 6, 1995, Ms. McCormick mailed Ms. Brown her payment, along with a thank you letter that noted: "As per our original agreement, the design copyright and ownership of the quilt patterns for 'The Life Before' belong to you; Universal Studios used those patterns with your permission to make the quilt for the movie 'How to Make An American Quilt.'" (Pl.'s Mot. Summ. J. Exh. P.)

During this time, however, two additional events of significance occurred; Ms. Brown claims to have had no knowledge at the time of either of these events. First, at some point during the filming of the movie the studio decided to eliminate one of the flashback scenes involving "The Life Before" quilt; apparently as a result of this decision, the studio also scrapped the plan to create and use two different "The Life Before" quilts in the filming of the movie. Rather, the studio used only the one copy of "The Life Before" that Ms. Simmons had assembled using Ms. Brown's designs.

Secondly, during the preparation for filming Ms. McCormick created the "Marriage" block for the "Where Love Resides" quilt. As discussed above, the "Marriage" block contains the same elements as the "Wedding" block in "The Life Before" quilt, including "a man and a woman holding hands, a large crow flying above them." Ms. McCormick personally assembled this quilt

block, placing it near the center of the pattern of the "Where Love Resides" quilt. (*See* McCormick Decl. at ¶¶ 13, 15.) In fact, because the studio needed both finished and unfinished versions of the "Where Love Resides" quilt for filming, Ms. McCormick created two quilt tops with this pattern for use in the filming of the movie. (*See* McCormick Decl. at ¶ 15.) Regarding the creation of this block, Ms. McCormick states in her declaration prepared for summary judgment:

> The concept of the Marriage Block, with a man and woman holding hands, a crow and a stylized sun, was created without any input from plaintiff, before plaintiff faxed any designs to me. When I joined the production team in August 1994 the production team had viewed pictures of Powers'[s] quilts and had already drawn several versions of the Marriage Block which were on display.... I viewed the production team's drawings of the Marriage Block, and I consulted those drawings in the preparation of the Marriage Block.
>
> . . . .
>
> ... I incorporated the elements and style from the block in "The Life Before" quilt, but updated the expression because it was being incorporated into a 20th Century quilt. *In creating the Marriage Block I consulted the plaintiff's pattern for the wedding block in "The Life Before" quilt,* as well as the patterns for the Marriage Block prepared by the production team. I also consulted more modern folk art sources.

(McCormick Decl. at ¶¶ 6 & 13 (emphasis added).)

Ms. McCormick's declaration, however, does not provide her only statement on the subject. In fact, Ms. McCormick discussed the creation of this block in her book *Pieces of an American Quilt.* In the book, Ms. McCormick establishes a more specific connection between Barbara Brown's "Wedding" block design and the "Marriage" block for the "Where Love Resides" quilt:

> The next friendship block is made by Anna, the character Dr. Maya Angelou portrays. *I made this block using the pattern Barbara Brown had designed for the Marriage block in* The Life Before *quilt.* Anna owns the family heirloom quilt given to her by her Aunt Pauline, which tells the story of her family and how her grandparents met. *The block in this quilt is a duplication of the Marriage block in* The Life Before *quilt.*[4]

(*Pieces of an American Quilt* 20 (emphasis added).) In fact, the caption below the picture of the "Marriage" block from "Where Love Resides" on the following page reads: "The Marriage block *designed by Barbara Brown."* (*Id.* at 21 (emphasis added).)

Ms. Brown asserts that she first learned in a telephone conversation on June 29, 1995, that Ms. McCormick planned to use this design for the "Marriage" block. She also asserts, upon first learning of this duplication, that she immediately cautioned Ms. McCormick that no one could copy, publish photographs, or otherwise publicly display either "The Life Before" or the "Where Love Resides" quilts, both of which Ms. Brown claimed contained her copyrighted designs, without her permission. (*See* Pl.'s Mot. Summ. J. at 8; Am. Compl. at ¶¶ 26–27.)

**B. The Merchandising Efforts**

In the summer months of 1995, with the movie set to open in theaters in early October, the studio's consumer products division, MCA/Universal Merchandising, Inc. (now known as Universal Studios Consumer Products, Inc., and referred to here as "Universal Merchandising"), began the process of licensing merchandising rights associated with the movie. On July 20, Universal Merchandising entered an agreement with defendant Marketing and Financial Management Enterprises, Inc. ("M & FM"), to solicit and supervise merchandising license agreements for *How to Make an American Quilt.* (Defs.' Cross–Mot. Summ. J. Exh. E, Decl. Chet Swenson at ¶ 5.) While Ms. Brown claims a host of infringing acts as a result of the defendants' merchandising efforts, the dispute essentially centers on three projects: (i) an inspirational book entitled *Where Love Resides* by defendant, That Patchwork Place, Inc. (now known

---

4. As noted previously, the parties frequently confuse the titles of these two blocks. In her book, Ms. McCormick identifies both the "Marriage" block in "Where Love Resides" and the "Wedding" block in "The Life Before" as "Marriage" blocks.

as Martingale & Co., Inc., and referred to here as "Patchwork"); (ii) promotional efforts by Ms. McCormick for her behind-the-scenes book, *Pieces of an American Quilt;* [5] and (iii) the creation of an oil painting by defendant John Simpkins and derivative fine art prints by defendants The Greenwich Workshop, Inc. ("Greenwich"), based upon the "Where Love Resides" quilt.

Four additional events occurred during this merchandising period that concern this discussion. First, the movie opened to the general public in the United States on October 6, 1995; second, Ms. Brown first sold a copy of her quilt block patterns for "The Life Before" to someone other than Ms. McCormick on October 15, 1995 (*see* Pl.'s Mot. Summ. J. Exh. V); third, Ms. McCormick filed copyright applications for the "Where Love Resides" and "The Life Before" quilts on January 11, 1996 (*see* Compl. [Docket No. 1] Exhs. J & M); [6] and fourth, Ms. Brown filed a copyright application for her quilt block patterns exactly three months after her sale on January 16, 1996 (*see* Pl.'s Mot. Summ. J. Exh. W).

### 1. Patchwork's Book *Where Love Resides*

On November 8, 1995 Patchwork and M & FM entered an agreement, retroactively effective to October 24, licensing Patchwork to produce an inspirational style book, entitled *Where Love Resides: Reflections on Love and Life.* (Defs.' Cross–Mot. Summ. J. Exh. E, Decl. Chet Swenson at ¶ 6.) The book contained still photographs and quotations from the movie, including photographs of several of the quilts. Significantly, the book contained several photographs of the "Marriage" block from the "Where Love Resides" quilt, both as part of the quilt as a whole as well as individually. (*See* Pl.'s Mot. Part. Summ. J. Exh. P.) It also contained a photograph of the complete "The Life Before" quilt. (*Id.*) Patchwork advertised the upcoming book in a quilting magazine, using a photograph of the "Where Love Resides" quilt. (*See* Compl. [Docket No. 1] Exh. X.)

### 2. Ms. McCormick's Promotional Activities for Her Book *Pieces of an American Quilt*

Ms. McCormick also began negotiating with Universal Merchandising for the rights to publish a behind-the-scenes book, including the rights to photographs of the five quilts from the movie. In early November 1995, Ms. McCormick attended the International Quilt Festival in Houston, Texas, and participated in M & FM's exhibit booth, at which M & FM displayed both the finished and unfinished copies of the "Where Love Resides" quilt. (*See* Pl.'s Mot. Summ. J. Exhs. X & AR.) [7] At the exposition, Ms. McCormick wore a t-shirt depicting the "Where Love Resides" quilt. Universal Merchandising had created the t-shirts, as

---

5. Significantly, Ms. Brown does not assert a claim for copyright infringement against Ms. McCormick or her publisher, C & T Publishing, for the actual publication of *Pieces of an American Quilt.* Ms. Brown entered an agreement with C & T Publishing in April 1996 authorizing the use of photographs of "The Life Before" and the "Marriage" block from "Where Love Resides" in the book, in return for a royalty and an advertisement for her patterns. (*See* Defs.' Mot. Summ. J. at 4 n. 4, 11.)

6. Ms. Brown would later contest the validity of Ms. McCormick's applications to register copyrights in the two quilts.

7. The brochure from Universal's exhibit provides some clues to the anticipated scope of the movie's associated merchandising. (*See* Pl.'s Mot. Summ. J. Exh. AR.) For example, the brochure announces that "[Brother International Corporation] look[s] forward to working with MCA/Universal in designing licensed 'How to Make An American Quilt' sewing products that will help you to make an American Quilt of your own"; "EZ International/Quilt House ... is proud to be a sponsor and licensee for 'How to Make An American Quilt.' ... Look for our "How to Make An American Quilt" fabric quilt labels, templates, stencils and quilt kits soon to be released." The brochure solicits offers for further merchandising licenses from interested parties. Furthermore, according to Ms. Brown, by this time the defendants had already given some consideration to the licensing of a television series based on the film. (*See* Am. Compl. at ¶ 92.)

While the record at summary judgment does not explain why these other marketing efforts did not materialize, the studio's accounting figures for the movie provide at least one possible explanation. (*See* Defs.' Mot. Summ. J. Exh. K, Decl. Barbara A. Luna at ¶ 7 (indicating that the movie generated gross revenues in domestic release of only approximately $25 million, resulting in a net loss of approximately $40 million).)

well as tote bags depicting the "Where Love Resides" quilt, as a promotional giveaway. (McCormick Decl. at ¶ 18; Defs.' Mot. Summ. J. Exh. N, Decl. Buffy Shutt; Pl.'s Mot. Summ. J. Exh. AN.)

In connection with her behind-the-scenes book project, Ms. McCormick contacted Ms. Brown. Ms. Brown asserted rights in her designs for "The Life Before," and also asserted rights in the design for the "Marriage" block from "Where Love Resides," and insisted upon appropriate compensation for permission to use these works. A long and complicated series of negotiations followed between Ms. McCormick, Universal Merchandising, and (at least peripherally) Ms. Brown, during which several parties threatened legal action and made conflicting claims of rights to various portions of the quilts. In fact, the dispute addressed both book projects—Patchwork's book *Where Love Resides* as well as Ms. McCormick's book *Pieces of an American Quilt.*

In April 1996, Ms. McCormick entered an agreement with Universal Merchandising for the rights to publish *Pieces of an American Quilt,* in exchange for "releas[ing] Amblin, [Universal Merchandising], M & FM, [M & FM's principals] the Stroles, and That Patchwork Place from liability arising from licensing and publication of That Patchwork Place's book *Where Love Resides.*" (*See* Compl. [Docket No. 1] Exh. T.) Around the same time, Ms. Brown entered an agreement mentioned above with Ms. McCormick's publisher, C & T Publishing, authorizing them to use photographs of "The Life Before" and the "Marriage" block from "Where Love Resides" in the book *Pieces of an American Quilt,* in return for a royalty and an advertisement for her patterns. (*See* Defs.' Mot. Summ. J. at 4 n. 4, 11.) C & T Publishing released *Pieces of an American Quilt* in April 1996.

Ms. Brown, however, continued to insist that Ms. McCormick herself negotiate with Ms. Brown regarding any other use of "The Life Before" or the "Marriage" block in "Where Love Resides." In June 1996, Ms. Brown corresponded with Ms. McCormick, demanding that Ms. McCormick cease dis-

playing "The Life Before" and "Where Love Resides" in her promotional efforts for *Pieces of an American Quilt;* Ms. Brown sent a copy of her correspondence to Universal Merchandising. (Compl.Exh. K.) Ms. McCormick refused to comply with these demands. During the Summer and Fall of 1996, Ms. McCormick conducted a publicity tour for her book which included an appearance on a cable quilting program, "Simply Quilts." While on the cable program, Ms. McCormick displayed and discussed "The Life Before" quilt.[8]

### 3. Simpkins's Painting and Greenwich's Fine Art Print

The last merchandising effort which concerns this case involves the production of an oil painting and associated fine art prints. In April 1995, Universal Merchandising entered a licensing agreement with Greenwich that permitted defendant John Simpkins to produce an oil painting based upon the "Where Love Resides" quilt; Greenwich would produce a limited quantity of fine art print reproductions of the painting. (*See* Defs.' Mot. Summ. J. Exh. L, Decl. Michael P. Meskill.) The painting, which depicts the "Where Love Resides" quilt, includes a depiction of the "Marriage" block. Greenwich first publicly displayed the prints and offered them for sale in September 1995. (*See* Meskill Decl. at ¶ 3.)

## IV. Summary Judgment Discussion

### A. Ms. Brown's Claims in General

Ms. Brown's Complaint asserts a myriad of claims of copyright infringement as well as related state law causes of action. In general, Ms. Brown bases her claims on the allegation that any unauthorized display of "The Life Before" infringed upon her copyrighted designs. In addition, Ms. Brown claims that the design for the "Marriage" block in "Where Love Resides" was an infringing copy or derivative work of her copyrighted design for the "Wedding" block in "The Life Before," so that any use of that block also infringed upon her copyright. Because the

---

**8.** Ms. Brown subsequently also reached a settlement agreement with the producers for the cable programs on which Ms. McCormick appeared while promoting her book, dismissing them from this action.

"Marriage" block appears near the center of the "Where Love Resides" quilt, practically any display of the "Where Love Resides" quilt would include this allegedly infringing design.

Ms. Brown's sole claim with respect to Amblin' and Universal relates to the studio's use of the "Marriage" block in the two copies of the "Where Love Resides" quilt top that appeared in the movie (and subsequent video release). Essentially, Ms. Brown claims that her agreement to allow the studio to create "two quilts" did not permit this use of her designs.

Ms. Brown's claims against Ms. McCormick include copyright infringement claims for: (i) creating and providing the studio with the "Marriage" block for "Where Love Resides"; (ii) displaying the "Where Love Resides" quilts and the "Where Love Resides" t-shirt at the Houston exposition in November 1995; and (iii) displaying both "The Life Before" and "Where Love Resides" during her book promotion, both in person and on the cable television program "Simply Quilts." [9]

As to the other defendants, Ms. Brown asserts copyright infringement: (i) against Universal Merchandising for granting merchandising rights in her copyrighted designs; (ii) against Universal Merchandising & M & FM for creating and displaying the t-shirt bearing the "Where Love Resides" print; [10] (iii) against Universal Merchandising and M & FM for licensing Patchwork to create the *Where Love Resides* book; (iv) against Patchwork for its use of the "Marriage" block from the quilt "Where Love Resides" in the advertising for the book *Where Love Resides*, as well as the inclusion of the "Marriage" block and "The Life Before" quilt in

the book; [11] (v) against Universal Merchandising and M & FM for licensing Greenwich to produce its line of fine art prints bearing a likeness of "Where Love Resides"; (vi) against Greenwich for advertising and for producing the prints; and (vii) against Mr. Simpkins for creating the oil painting on which Greenwich based its prints.

The parties have raised a host of issues at summary judgment. In the following discussion, the Court will first consider whether Ms. Brown has established a prima facie case for infringement. Thereafter, the Court will examine the various defenses that the defendants pose.

### B. Ms. Brown's Prima Facie Case

■ To establish a claim for copyright infringement, a plaintiff must demonstrate (i) ownership of a valid copyright, and (ii) copying of the "original" elements of the work. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

### 1. Ownership of a Valid Copyright

■ A certificate of copyright registration constitutes prima facie evidence of the validity of the certificate and the facts stated in the certificate. *See M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir.1986). In this case, Ms. Brown registered a copyright for the fifteen quilt block patterns constituting "The Life Before" quilt in January 1996. Attempting to overcome the presumption that this registration creates, the defendants claim that Ms. Brown's work was not "original," particularly with respect to the "Wedding" block depicting "a scene with a

---

9. Ms. Brown's Amended Complaint also includes two claims of unfair competition predicated upon fraud against Ms. McCormick. Ms. Brown bases these claims in part upon representations that Ms. McCormick made to Ms. Brown in telephone conversations in the Fall and Winter of 1996. According to Ms. Brown, at that time Ms. McCormick stated that she no longer sought to vindicate any claim of copyright for the finished quilts; in fact, on January 11, 1996 Ms. McCormick had applied for copyright registration for both "The Life Before" and the "Where Love Resides" quilts. (*See* Am. Compl. at ¶¶ 39–62.) As discussed below, this Court finds that the Copyright Act preempts these claims.

10. Defendants claim that Universal Merchandising and M & FM "had no involvement whatsoever with the t-shirts"; indeed, Universal Studios itself was the defendant who ordered their production. (*See* Defs.' Cross–Mot. Summ. J. Exh. N, Decl. Buffy Shutt, at ¶¶ 2–3.) Nevertheless, as the following discussion explains, the question of liability for the named defendants for publicly displaying the t-shirt remains open.

11. Ms. Brown also asserts a fraud claim against Patchwork for failing to credit her with the design of "The Life Before." As discussed below, this Court finds this claim preempted.

black bird flying over a man and a woman holding hands."

To be subject to copyright, a work must be "original." 17 U.S.C. § 102(a); *see Feist,* 499 U.S. at 345–47, 111 S.Ct. 1282. As the Supreme Court stated in *Feist:*

> The *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

*Feist,* 499 U.S. at 345, 111 S.Ct. 1282 (citations omitted). On this standard, the Court finds that Ms. Brown's designs are "original" and therefore subject to copyright. Ms. Brown created the designs herself; although the script gave descriptions of some of the elements for the designs, these descriptions were "vague," and Ms. McCormick instructed Ms. Brown to use her own judgment in creating the actual designs. Furthermore, Ms. McCormick repeatedly cautioned Ms. Brown not to create copies of the Harriet Powers "Bible Quilts"; for the studio's purposes, Ms. Brown's designs needed to possess a similar style to the "Bible Quilts," but also needed to be, in a word, original.

On the other hand, copyright protection may extend only to those components of a work that are original to the author. *Feist,* 499 U.S. at 348, 111 S.Ct. 1282. Ms. Brown could not therefore claim copyright protection for all subsequent quilt designs that included, for example, "a scene with a black bird flying over a man and a woman holding hands." Those elements existed long before Ms. Brown's quilt designs, and indeed existed in Harriet Powers's "Bible Quilts" long before either Whitney Otto's novel or the script for the movie. Instead, to sustain an action for copyright infringement Ms. Brown would need to demonstrate unauthorized copying of her original expression of these elements. It is to the task of establishing unauthorized copying to which the Court addresses itself next.

### 2. Unauthorized Copying

To establish unauthorized copying, a plaintiff must establish copying in fact and "substantial similarity" between the copy and plaintiff's original. *See, e.g., Ringgold v. Black Entertainment Television, Inc.,* 126 F.3d 70, 74–75 (2d Cir.1997). In practice, however, these two elements frequently merge, because a plaintiff may establish copying in fact either: (i) by providing direct evidence of copying; or (ii) by providing circumstantial evidence of copying that demonstrates the defendants' access to her work and "substantial similarity" between the works. *Ferguson v. NBC,* 584 F.2d 111, 113 (5th Cir.1978). With respect to the designs in "The Life Before," the defendants do not dispute that the designs are Ms. Brown's and that their use of the designs satisfies these elements.

Regarding the "Marriage" block in "Where Love Resides," Ms. Brown arguably need not resort to the common tactic of proving access as well as "substantial similarity," because the record provides some direct evidence of copying. Ms. McCormick herself admits in *Pieces of an American Quilt* that the design for the "Marriage" block in "Where Love Resides" is Ms. Brown's design and that Ms. McCormick duplicated the "Wedding" block from "The Life Before" when creating the "Marriage" block. Ms. McCormick's account further bolsters the conclusion that she copied "original" material from Ms. Brown's designs, because Ms. McCormick made a point of noting in her narrative how unsatisfactory earlier attempts at a design for this block had been, notwithstanding the availability of the "Bible Quilts" and other designs; it was only after Ms. McCormick consulted Ms. Brown's "Wedding" block that the "Marriage" block achieved a satisfactory design. From this evidence and from an examination of the two blocks, a jury could conclude that the design

of the "Marriage" block resulted from copying the original elements in the "Wedding" block from "The Life Before."

Even discounting such evidence, it would be possible for a jury to find, given Ms. McCormick's access to Ms. Brown's design, that the designs of the "Wedding" block from "The Life Before" and the "Marriage" block in "Where Love Resides" were so "substantially similar" to constitute circumstantial evidence of unauthorized copying. A reasonable jury could find that the size, shape, placement, and orientation of the human figures, as well as the size, shape, and placement of the bird figure in the "Marriage" block bear a substantial similarity to the figures in the "Wedding" block. That some of the elements in Ms. Brown's design resemble the "Bible Quilts" or other matter in the public domain is not itself determinative. *See Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 249, 23 S.Ct. 298, 47 L.Ed. 460 (1903) (Holmes, J.) ("Others are free to copy the original. They are not free to copy the copy."). Likewise, because a copyright owner has the right to exclude others from infringing through the development of derivative works, *see* 17 U.S.C. § 106(2), that Ms. McCormick may have added to this design, or even developed from Ms. Brown's original design into a separate work, is also irrelevant.

Given the validity of Ms. Brown's copyright in her designs and the evidence of unauthorized copying, this Court finds that Ms. Brown has established a prima facie case of copyright infringement. The Court next turns to the defendants' claimed defenses.

## C. The Use of Quilts and Joint Works

The defendants contend that this Court should treat the studio's production team, including Ms. McCormick, as authors of a "joint work"—namely, the finished quilts—and that they are therefore incapable of copyright infringement. "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Although this argument would not relieve the defendants of the need to account to Ms. Brown, *see* 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (hereinafter "Nimmer") § 6.12[A], at 6–34.1 (1998), nevertheless it would arguably free them from claims of infringement, because joint authors cannot infringe their own work.

As Nimmer points out, the statute's definition of "joint work" really defines joint *authorship*; for example, it is possible for a joint result although there has been no joint authorship. Nimmer, § 6.01 at 6–3. There are two situations in which a joint authorship may result under the statute: (i) when the work of the authors is "inseparable," so that it is not possible to identify the independent work of each author; or (ii) when the work of the authors is "interdependent," so that, as Nimmer says, "in the absence of express agreement to the contrary, [it] may be presumed [that the authors] have intended that each shall own an undivided interest in the combined product of their respective efforts." Nimmer, § 6.02 at 6–4.1; *see* 17 U.S.C. § 101. In this case, neither of these two circumstances exist.

First, Ms. Brown's designs are not "inseparable" from the work of others on the quilts. Both parties agree to the precise contours of her work, and indeed, Ms. Brown herself was quite careful in negotiations to delimit precisely what her responsibilities would be. Moreover, while it is clear that Ms. McCormick and others contributed to the fabric selection and physical construction for both "The Life Before" and "Where Love Resides," neither Ms. McCormick nor anyone else contributed to Ms. Brown's designs, apart from the "vague" instructions of the script. In that regard, general specifications alone are insufficient to qualify a person as a joint author. *See Childress v. Taylor*, 945 F.2d 500, 506–07 (2d Cir.1991).

Moreover, Ms. Brown's contributions to the finished quilts were not "interdependent" with others' contributions, either in fact or in intention. Ms. Brown's contract and subsequent communications with Ms. McCormick make quite clear that Ms. Brown did not intend to share the creative rights in her designs with anyone; without the intent to become a joint author, there is not a joint work. *See Childress*, 945 F.2d at 507–08.

The Court is also not persuaded, notwithstanding Ms. Brown's intent to maintain her

designs' independence, that Ms. Brown's quilt designs are nevertheless "interdependent" with the assembly work that created the quilts. Lyrics and music to a song, for example, are the archetype for "interdependent" parts; without the music, the song lyrics lose much, if not all, of their value. *See, e.g., Edward B. Marks Music Corp. v. Jerry Vogel Music,* 140 F.2d 266 (2d Cir. 1944). In the *Edward B. Marks Music* case, Judge Learned Hand observed:

> The popularity of a song turns upon both the words and the music; the share of each in its success cannot be appraised; they interpenetrate each other as much as the notes of the melody, or separate words of the 'lyric.' ... To allow the author to prevent the composer, or the composer to prevent the author, from exploiting that power to please, would be to allow him to deprive his fellow of the most valuable part of his contribution; to take away the kernel and leave him only the husk.

*Edward B. Marks Music,* 140 F.2d at 267; *see also* Nimmer, § 6.02 at 6–5 ("A lyricist is not likely to invest the effort and time attendant to such authorship unless he believes that he will own something more than a poem.").

By contrast to the lyrics and music of a song, whose value lies solely in their combination, Ms. Brown's designs are templates which a quilter may readily use repeatedly to produce any number of quilts in any combination. The defendants themselves demonstrated this fact by producing two different quilts incorporating elements of Ms. Brown's designs. Moreover, Ms. Brown successfully marketed her quilt block designs apart from defendants' contributions to the finished quilts. Ms. Brown's designs therefore have value separate from the defendants' selections of fabrics with which to make the individual quilts at issue; accordingly, they are not "interdependent" with the defendants' work, and Ms. Brown's designs are not a "joint work." [12]

### D. Ms. Brown's Agreement for "Two Quilts"

■ With regard to the studio's use of the "Marriage" block in the filming and distribution of the movie, the issue of copyright infringement turns upon the interpretation of the "two quilts" language in Ms. Brown's letter agreement with Ms. McCormick. When contract language is ambiguous, meaning that it is susceptible to different reasonable interpretations, it is for a jury to determine the proper interpretation. *See, e.g., Shapiro v. Massengill,* 105 Md.App. 743, 661 A.2d 202, 208 (Md.Ct.Spec.App.), *cert. denied,* 341 Md. 28, 668 A.2d 36 (Md.1995).[13]

■ This Court believes that the "two quilts" language is sufficiently ambiguous as to be susceptible to at least three potential readings. A jury could find that the contract authorized the studio to use Ms. Brown's designs for unlimited copies of two overall quilt designs, thereby alleviating the studio of any copyright infringement, because the studio used Ms. Brown's designs in just two overall quilt designs: namely, one copy of "The Life Before" and two copies of "Where Love Resides." Alternatively, a jury could find that the contract authorized the studio to create just two physical quilts, of whatever design; on this view, at least one of the three quilts that the studio used in the movie constituted an infringing design.

Finally, using several tools of contract interpretation, a jury could find that the term "two quilts" meant precisely what Ms. Brown understood the term to mean—two copies of

---

**12.** Defendants' reliance on *Martin v. Cuny,* 887 F.Supp. 1390 (D.Col.1995), and *Mister B Textiles, Inc. v. Woodcrest Fabrics, Inc.,* 523 F.Supp. 21 (S.D.N.Y.1981), in this regard is misplaced. In *Martin,* Mr. Cuny had supplied to Mr. Martin the logos and t-shirts necessary for Mr. Martin's photograph; that court concluded, without analysis, that Mr. Cuny's contribution and the parties' intentions justified treating the photograph as a "joint work." *Martin,* 887 F.Supp. at 1393. In *Mister B,* the court made a factual determination on a motion for preliminary injunction, again without substantive analysis, that the plaintiff had participated in the creation of the copyrighted design. *Mister B,* 523 F.Supp. at 25. Neither of these cases contributes meaningfully to the analysis of: (i) the parties' intent or (ii) the defendants' "contributions" to plaintiff's designs in this case.

**13.** In this federal question jurisdiction case which involves a Maryland contract, this Court applies Maryland substantive contract law. *See Erie v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); 28 U.S.C. § 1652 (1998).

"The Life Before" for use in different flash-back scenes in the movie, thereby subjecting the studio to potential infringement for both copies of the "Marriage" block in the finished and unfinished "Where Love Resides" quilt tops. On this view, the jury might find that the reference to Ms. Brown's telephone conversations with Ms. McCormick, in which the two women discussed the creation of two copies of "The Life Before," informs the "two quilts" language in the contract. The jury could therefore construe the ambiguous language of the agreement against Ms. McCormick, who was both the contract drafter and the party with knowledge of the other's understanding of a contract term.[14] Accordingly, whether the studio infringed upon Ms. Brown's designs by its use of two copies of "Where Love Resides" and one copy of "The Life Before" is an unresolved material question of fact.

### E. Fair Use

█ Defendants also claim that their use of Ms. Brown's designs constitutes "fair use," *see* 17 U.S.C. § 107, thereby avoiding infringement. Considering the four statutory factors in Section 107, this claim is without merit. Regarding the first factor, "the purpose and character of the use," this Court notes at the outset that the defendants' use of Ms. Brown's designs does *not* fall within any of Section 107's "illustrative" categories for typical fair use, such as criticism, comment, news reporting, teaching, scholarship, or research. *See* 17 U.S.C. § 107; *see also Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 78 (2d Cir.1997) (observing that these categories should guide a court's evaluation of the first factor). Moreover, it is clear that the defendants in this case ' "[stood] to profit from [their] exploitation of the copyrighted material without paying the customary price.' " *See Amsinck v. Columbia Pictures Indus., Inc.*, 862 F.Supp. 1044, 1049 (S.D.N.Y.1994) (quoting *Harper & Row Publishers v. Nation Enterprises*, 471 U.S.

539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)).

Ms. Brown's course of dealing with the defendants reveals her consistent intention to receive compensation for the use of her designs; it would eviscerate Ms. Brown's contractual insistence on the retention of her creative rights in the designs to allow further exploitation without such compensation. Finally, it is also clear that the defendants used Ms. Brown's designs for precisely the use for which they were intended—to create illustrated art in a quilt format. *See Ringgold*, 126 F.3d at 79. The first statutory factor, therefore, weighs against a finding of fair use.

The second factor, "the nature of the copyrighted work," also militates against a finding of fair use. "[T]he more creative a work, the more protection it should be accorded from copying." *Amsinck*, 862 F.Supp. at 1050. Ms. Brown's work required a great deal of imagination and creativity; in fact, the defendants counted on that creativity when approaching her initially for her designs. The quilt block patterns do not reflect the sort of primarily functional device which often requires less copyright protection. Instead, the quilt blocks clearly fall within the traditional ambit of copyright protection for original, creative work.

The third factor, "the amount and substantiality of the portion used" also weighs against a finding of fair use. As explained more fully below, this Court considers each of Ms. Brown's fifteen quilt block patterns to be a separate, copyright-protected work. Provided that a jury finds that the defendants infringed Ms. Brown's design for the "Wedding" block in "The Life Before" by displaying the "Marriage" block in "Where Love Resides," for example, this infringement was both frequent and total. Moreover, the infringement, if it occurred, represented a significant and central portion of the defendants' infringing works.

---

14. Ms. Brown now also contends, with some justification, that if Ms. McCormick was aware in October 1994 that the term "two quilts" in their agreement meant to refer to "Where Love Resides" and "The Life Before" but instead represented to Ms. Brown that the studio would use the designs to create two *copies* of "The Life Before," then the agreement is void because it is based upon false or fraudulent representations, and *all* the uses of Ms. Brown's designs are unauthorized. Again, this contention involves issues of fact not appropriate for summary adjudication.

Finally, regarding the fourth statutory factor, it is true that "the effect of the [defendants'] use upon the potential market for or value of" Ms. Brown's design *apart from* sale to the defendants themselves was only positive; it could only help Ms. Brown to sell more of her designs to those who saw defendants' movie, books, or advertising. Such an argument, however, ignores that the defendants' appropriation removed Ms. Brown's most profitable market: namely, the sale of licenses for her designs to the defendants themselves for use in the movie and associated merchandising. *See, e.g., Ringgold,* 126 F.3d 70, 73, 77–78 n. 8, 80–81 (2d Cir.1997) (noting that the copyright "normally give a copyright owner the right to seek royalties from others who wish to use the copyrighted work" and observing that the "licensing market [is] relevant to the fourth factor analysis"). Accordingly, each of the four statutory factors weighs against finding that the defendants' use of Ms. Brown's designs constituted fair use under Section 107.

### F. Preemption of State Claims

Next, defendants claim that the Copyright Act preempts Ms. Brown's state law claims. The Copyright Act preempts state law claims that are "equivalent" to the rights that the Copyright Act provides. *See* 17 U.S.C. § 301(a). However, the Copyright Act does not preempt state law claims that include elements additional to or different from the copyright action, so that the the state law cause of action is qualitatively different than the Copyright Act. *See* 17 U.S.C. § 301(a); *Rosciszewski v. Arete Assocs., Inc.,* 1 F.3d 225, 229–30 (4th Cir.1993). In this case, each of Ms. Brown's claims under state law attempt to vindicate the same rights that she pursues through The Copyright Act. None establish a qualitative difference from the prohibited acts within the Copyright Act.

Ms. Brown attempts to salvage (at least one of) her state law claims on the ground that Ms. McCormick committed civil conspiracy with her attorney to commit copyright infringement. Firstly, Ms. Brown pled no conspiracy counts. Even assuming that she properly had, while the formulation for civil conspiracy adds the element of agreement to the elements that copyright infringement requires, the right protected by such a cause of action in this case would serve merely to vindicate the same right as under the Copyright Act. *See Rosciszewski,* 1 F.3d at 230 ("[An] action will not be saved from preemption by elements such as awareness or intent, which alter the action's scope but not its nature.") (citations omitted) (internal quotation marks omitted). Accordingly, this Court shall GRANT summary judgment in favor of the defendants with respect to Ms. Brown's state law claims, that is, Counts IV (Unfair Competition—Breach of Contract against Ms. McCormick), V (Unfair Competition—Fraud against Ms. McCormick), VI (same), VII (Unfair Competition—Conversion against Ms. McCormick), VIII (Unfair Competition—Malicious Interference with Economic Relations against Ms. McCormick), and XV (Unfair Competition—Fraud against Patchwork).

### G. Other Defenses

The defendants raise other issues at summary judgment that the Court need not address at length here, except to say that they are without merit. For example, the Court finds no estoppel or laches from the plaintiff's failure to raise a claim of copyright infringement immediately upon learning of the use of her design in the "Marriage" block for the "Where Love Resides" quilt; Ms. Brown was entitled to investigate her claim and to explore other avenues of resolution before bringing suit within the statute of limitations, and Ms. Brown was certainly adamant in notifying the defendants of her intent to stand upon her claim of copyright. Apart from the discussion above of the "originality" of Ms. Brown's designs, whether Ms. McCormick's design for the "Marriage" block in "Where Love Resides" merely imitates unprotectable stock elements, or is so changed from Ms. Brown's designs as to be unrecognizable, are questions of fact not appropriate for summary adjudication.

Likewise, John Simpkins's oil painting may have "interpreted," but indisputably copied, the "Marriage" block from "Where Love Resides"; provided that Ms. McCormick infringed Ms. Brown's designs, a jury may find that Simpkins's oil painting and Greenwich's prints are derivative works of

Ms. Brown's original designs. Because both "The Life Before" and "Where Love Resides" are featured aspects of the movie and the merchandising efforts, this Court does not find that defendants' usage qualifies as *de minimis*. *See Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 75–77 (2d Cir.1997) (applying Librarian of Congress's standards for "featured" and "background" works as indication that even "background" usage is ordinarily not *de minimis*). Ms. McCormick's display of the quilts on a national cable television broadcast did not fall within the exception of 17 U.S.C. § 109(c) for display "at the place where the copy is located." Any other arguments within defendants' expansive brief are similarly without merit.

## V.  Other Motions Discussion

### A.  Partial Summary Judgment on Statutory Damages and Attorney's Fees

In addition to moving for summary judgment on the case as a whole, the parties have also cross-moved for partial summary judgment on Ms. Brown's right to elect statutory damages.[15] Under the Copyright Act, Ms. Brown may "elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable." 17 U.S.C. § 504(c)(2). The Copyright Act limits that right, however, by providing that a court shall not award statutory damages for

(1) any infringement of copyright in an *unpublished* work commenced before the effective date of its registration; or

(2) any infringement of copyright *commenced after* first publication of the work and *before* the effective date of its registra-

tion, *unless* such registration is made within three months after the first publication of the work.

17 U.S.C. § 412 (emphasis added). The defendants accepted, for purposes of their motion for partial summary judgment, that Ms. Brown first "published" her designs on October 15, 1995. (*See* Defs.' Mot. Part. Summ. J. at 8.) They contend, however, that with the possible exception of Patchwork, all of the defendants "commenced" their allegedly infringing activities prior to that date.

Ms. Brown's argument in this regard hinges in part upon treating all fifteen of the quilt blocks that she created as independent works. For example, Ms. Brown concedes that Ms. McCormick commenced her alleged infringement of Ms. Brown's "Wedding" block prior to the October 1995 publication date; but, Ms. Brown contends, Ms. McCormick did not commence infringing the other fourteen blocks until Ms. McCormick displayed "The Life Before" quilt without Ms. Brown's permission on the "Simply Quilts" television program in the Fall of 1996. Similarly, Ms. Brown claims that Universal Merchandising and M & FM first commenced infringing the fourteen designs other than the "Wedding" block when those two defendants executed their licensing agreement with Patchwork on November 8, 1995 (retroactive to October 24, 1995).

Although Ms. Brown had in mind that the studio would use her quilt block patterns collectively in "The Life Before," it is clear from her behavior and from her agreement with Ms. McCormick that Ms. Brown considered the quilt block patterns to be individual works. Ms. Brown's October 1994 agreement with Ms. McCormick called for Ms. Brown to create "design *fifteen 16*" *(finished)* blocks in the style of African American story

---

**15.** Because the issues are related, Ms. Brown also seeks in her motion to resolve her right to obtain costs and attorney's fees. *See* 17 U.S.C. § 505. For the sake of convenience, the Court will refer to both of these remedies as "statutory damages."

Defendants apparently do not challenge through this motion Ms. Brown's right to elect statutory damages with respect to Patchwork. Ms. Brown, on the other hand, sought summary judgment on the right to recover statutory damages from: Patchwork, for including both quilts

in its publication of the book *Where Love Resides;* Universal Merchandising and M & FM, for licensing Patchwork to publish its book; and Ms. McCormick, for displaying both quilts while appearing on the "Simply Quilts" cable television program. Ms. Brown therefore is not seeking summary judgment on the right to recover statutory damages from Amblin', Universal, Greenwich, or Mr. Simpkins; in fact, she expressly waived her right to such damages with respect to the studio defendants.

quilts." Ms. Brown labeled and titled each individually, placed individual copyright notices on each one, and transmitted the blocks individually to Ms. McCormick. In the presumptive act of publication in October 1995 as well, Ms. Brown sold her designs as fifteen patterns. (*See* Pl.'s Mot. Summ. J. Exh. V.) The defendants, too, demonstrated the individual nature of the guilt block patterns: for example, Ms. McCormick allegedly copied just one block, the "Wedding" block, to create the "Marriage" block for "Where Love Resides"; and in the book projects, the defendants frequently picture individual blocks to illustrate individual motifs. In this case, the Court finds that the Ms. Brown created precisely what the agreement called for: fifteen individual sixteen-inch quilt block patterns.

Ms. Brown registered her fifteen quilt block designs collectively on January 16, 1996. Copyright registration is simply a formality, however, and it is possible to register multiple related works under a single registration certificate. *See* 17 U.S.C. § 408(c)(1) (providing the Register of Copyrights with authority to allow a "single registration for a group of related works"); 37 C.F.R. § 202.3(b)(3)(i)(A) (1998) (authorizing the registration under one application of all "copyrightable elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication, and in which the copyright claimant is the same"); *Behnam Jewelry Corp. v. Aron Basha Corp.,* 45 U.S.P.Q.2d 1078, 1087–88 (S.D.N.Y.1997) (examining the requirements of the statute and regulation and upholding the single registration of twelve individual, but related, baby shoe pendant jewelry designs); *see also* H.R.Rep. No. 94–1476, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5770 ("The provision empowering the Register to allow a number of related works to be registered together as a group represents a needed and important liberalization of the law now in effect."). The defendants do not contest the relatedness of Ms. Brown's designs; indeed, they suggest that the Court treat them as a unitary whole. Nevertheless, the Court finds that Ms. Brown's fifteen designs are "related" because they are in a similar style, depict thematically tied scenes in an identifiable storyline, and

can be used collectively to create a single, unified quilt, such as "The Life Before."

This Court finds that Ms. Brown's designs do indeed constitute fifteen individual works; accordingly, all else equal, Ms. Brown may seek statutory damages as provided in the statute with respect to all of the infringing acts by any one, or combination, of the defendants, with respect to any of the individual designs. Because the parties dispute many of the timing issues relating to the alleged infringements of each of the individual defendants, however, the Court cannot determine for a certainty that Ms. Brown *will* be entitled to statutory damages, should she prevail; only that, given the evidence and argument now before the Court, that Ms. Brown may *in theory* continue to elect to collect statutory damages. Accordingly, the Court shall DENY both defendants' Motion for Partial Summary Judgment and plaintiff's Motion for Partial Summary Judgment with respect to this issue.

## B. Discovery, Expert Witnesses, and Sanctions

Ms. Brown has moved to bar the testimony of defendants' expert witnesses because, she alleges, the defendants have failed to comply with discovery requirements. Simultaneously, Ms. Brown also seeks permission to extend time within which to designate any rebuttal expert witnesses to "within 30 days after defendants have fully complied with outstanding discovery requests." Related to these motions, Ms. Brown has filed a "notice" of defendants' failure to comply with the Court's discovery schedule, and a request for sanctions.

At their heart, these motions relate to the defendants' production of proprietary information. Defendants have refused to provide certain information without the parties entering a confidentiality protective order. As a result, the defense's expert witnesses, among others, testified at their depositions without revealing the entirety of the documents upon which they based their opinions. Ms. Brown contends, however, that defense counsel's requirement for a confidentiality agreement is a ruse. By example, Ms. Brown observes that she submitted a stipulated protective

order regarding confidential information to defense counsel by April 9, 1998, and that on April 24, defense counsel related to Ms. Brown that defense counsel had signed the confidentiality agreement but had not submitted it to the Court. Because the issues regarding the discovery production, confidentiality order, and expert witnesses are fact-intensive, the Court will schedule a Show Cause Hearing, in conjunction with further proceedings in the case, to resolve any outstanding discovery issues. Accordingly, the Court will RESERVE ruling on these motions until a later time.

### C. Motion to Seal

Finally, defendants move to seal several exhibits that the defendants submitted in connection with their cross-motion for summary judgment. As with the previous motions, at its heart the dispute regarding this motion centers on the parties' inability to reach agreement regarding a confidentiality agreement. In light of the discussion above resolving the issues on summary judgment, the Court finds that allowing defendants to preserve the confidentiality of their proprietary information, for the time being, is in the best interests of advancing the case and will not unduly prejudice Ms. Brown. Accordingly, the Court will GRANT the Motion to Seal Exhibits.

### VI. Conclusion

For the reasons discussed above, the Court shall, by separate Order, GRANT IN PART defendants' motion for summary judgment, otherwise DENY the cross-motions for summary judgment, and shall dispense with the remaining pending motions accordingly.